233 F.Supp. 718 (1964)
UNITED STATES of America, Plaintiff,
v.
ALUMINUM COMPANY OF AMERICA and Cupples Products Corporation, Defendants.
No. 61 C 147(2).
United States District Court E. D. Missouri, E. D.
September 22, 1964.
*719 William H. Orrick, Asst. Atty. Gen., Edna Lingreen, J. E. Waters, and James F. Buckley, Attys., Dept. of Justice, Washington, D. C., and Richard D. Fitz-Gibbon, Jr., U. S. Atty., St. Louis, Mo., for plaintiff.
Thos. S. McPheeters, Jr., Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., William K. Unverzagt, Pittsburgh, Pa., Herbert A. Bergson and Bergson & Borkland, Washington, D. C., for defendants.
MEREDITH, District Judge.
This matter was tried to the Court without a jury and is an action brought by the United States under Section 15 of the Clayton Act, 15 U.S.C. § 25, to enforce Section 7 of the Clayton Act, 15 U.S.C. § 18.
The defendants Aluminum Company of America (hereinafter referred to as Alcoa) and Cupples Products Corporation (hereinafter referred to as Cupples) transact business and are found within the Eastern District of Missouri.
Alcoa is a corporation organized and existing under the laws of the State of Pennsylvania, with its principal office in Pittsburgh, Pennsylvania. It is the largest domestic producer of primary aluminum. It is also engaged in the production and sale of semi-finished and finished aluminum products. Alcoa mines bauxite, an aluminum-bearing ore, in the United States and in certain foreign countries; it produces primary aluminum, intermediate aluminum products, and aluminum end products in several states in the United States and sells and ships such aluminum and aluminum products in interstate and foreign commerce.
Cupples is a corporation organized and existing under the laws of the State of Missouri, with its principal offices in St. Louis, Missouri. Cupples is and has been engaged in the fabrication of aluminum curtain wall, aluminum primary windows, and other aluminum products which it sells and has sold in interstate commerce. This Court has jurisdiction.
Alcoa acquired all of the outstanding stock of Cupples on January 22, 1960, in exchange for Alcoa stock valued at $6,750,000.
The government filed its complaint on April 27, 1961. On May 22, 1962, the government moved for a preliminary injunction and on July 30, 1962, this Court entered an order enjoining defendants from any further consolidation or comingling *720 of assets, personnel, pension plans and advertising. This order included the Corona plant in California, which was under construction by Alcoa for the Cupples operation. The defendants were required to operate the Corona plant as a part of Cupples and to advertise the products made therein as Cupples' products and not Alcoa's. This plant is now in operation. The cost to Alcoa was $4,390,628. The plant is now owned by Alcoa and is operated by Cupples.
Alcoa, Reynolds Metals Company, Kaiser Aluminum & Chemical Corporation, Ormet Corporation, Harvey Aluminum, Inc., and Anaconda Aluminum Company were the only domestic producers of primary aluminum in 1960. Their shares of total domestic primary aluminum production in 1960 were as follows:

 Tons
 Companies Short Percent
 Aluminum Company of
 America 727,000 36.1
 Reynolds Metals Company 494,282 24.5
 Kaiser Aluminum & Chemical
 Corporation 488,077 24.2
 _______ ____
 Subtotal 1,709,359 84.8
 Ormet Corporation 189,514 9.4
 Harvey Aluminum, Inc. 59,000 2.9
 Anaconda Aluminum
 Company 56,625 2.8
 _______ ___
 Subtotal 305,139 15.2
 _________ ____
 Total 2,014,498 100.0

The primary aluminum industry in the United States is a highly concentrated industry, with Alcoa, Reynolds Metals Company and Kaiser Aluminum & Chemical Corporation accounting for 84.8% of all the primary aluminum produced in the United States in 1960.
Alcoa accounted for 36.1% of all the primary aluminum produced by domestic producers in 1960.
In 1945 Alcoa was adjudged to have illegally monopolized the domestic primary aluminum industry, accounting for virtually one hundred percent of total production.
Final disposition of the monopoly case against Alcoa was deferred pending disposition of government-owned primary aluminum plants constructed during World War II.
The Surplus Properties Act of 1944 directed that surplus properties owned by the government be disposed of in such a manner and purpose as would foster competitive conditions in the aluminum industry.
Reynolds Metals Company and Kaiser Aluminum & Chemical Corporation entered the aluminum field as primary aluminum producers almost solely as a result of the government's disposal program.
Harvey Aluminum, Inc., and Anaconda Aluminum Company entered the primary aluminum industry with substantial aid from the government in the form of special tax credits and guaranteed loans.
With the entry of new producers into the market, domestic production of primary aluminum has increased from 1,246,912,000 pounds in 1948 to 4,235,856,000 pounds in 1962. 166,328,000 pounds were imported in 1948 and during *721 1962 this had increased to 615,042,000 pounds. Alcoa's share of the total domestic primary production in those years has been as follows:

 Percent Percent Percent
 1948 52 1953 49 1958 33
 1949 48 1954 46 1959 32
 1950 49 1955 45 1960 36
 1951 51 1956 45 1961 35
 1952 50 1957 43 1962 32

In 1950 Alcoa's total assets were $575,342,747, and by 1960 its total assets had increased to $1,374,134,148. Its growth has been substantial. In 1960 it had net sales and operating revenues of $861,211,772 and ranked twenty-second in size among other American industrial corporations.
As the largest domestic producer of primary aluminum, Alcoa is completely integrated from mine to consumer. In 1960, in addition to its facilities outside the country, it had in the United States seven raw materials locations, six research laboratories, three refining locations, and twenty-six fabricating facilities located from Connecticut to California.
In 1960 Alcoa had 2,786 sales employees and the cost allocated to its sales force was $43,446,412. It has twenty-one district sales offices.
The building and construction industry was Alcoa's largest single market for aluminum in 1960, accounting for approximately twenty-five percent of total shipments.
Prior to the acquisition of Cupples, neither Alcoa nor any of its subsidiaries engaged in the fabrication of curtain wall or primary windows, but Alcoa was a supplier of aluminum to Cupples and others for use in making these and other building products.
On initial capital of $80,000, Cupples, as an aluminum fabricator, commenced operation in 1946 by fabricating and selling double-hung windows made partly of wood and partly of aluminum. As it grew, Cupples extended its operations into fabrication of other types of aluminum architectural products, including various types of windows and curtain wall, and expanded its plant and facilities from one plant covering 32,000 square feet in 1946 to three plants, including a leased one, covering 283,000 square feet, immediately prior to its acquisition by Alcoa in 1960.
In 1959 the products produced by Cupples were: aluminum extrusions, aluminum primary windows, aluminum curtain wall, aluminum suspended ceiling systems, aluminum highway railings, non-residential aluminum doors, door frames and entrances.
At the time of its acquisition, Cupples had plans to expand to the west coast. Since the acquisition, Alcoa has financed the building of a plant for Cupples in Corona, California. Cupples today operates plants at St. Louis, Missouri; Dowagiac, Michigan; and Corona, California, at each of which it fabricates aluminum curtain wall and aluminum windows. These are not the only aluminum products created by Cupples, but they account for the significant portion of Cupples' sales.
Though not proved with precise nicety, insofar as it relates to a specified definition of curtain wall and non-residential windows, we have found the following to be a reasonably correct approximation of Cupples' total dollar net sales for the years stated and the approximate amount *722 of dollar sales in those years attributed to aluminum curtain wall and to non-residential windows as Cupples and Alcoa define this product:

 Non-Residential
 Total Sales Curtain Wall Windows 
1958 $13,768,547 $ 6,359,624 $3,200,000
1959 13,575,481 6,246,462 2,800,000
1960 15,196,611 9,426,551 2,300,000
1961 19,699,027 10,764,000 3,500,000

Cupples' assets in 1959 were $5,313,072 and in 1960 they were $7,881,216.
Cupples has sales offices throughout the United States and in 1960 it had 27 sales employees. The cost allocated to its sales force was in that year $196,708.
In 1959 Cupples' estimated demand for aluminum was 12,469,000 pounds, of which an estimated 8,008,000 pounds was used in the fabrication of non-residential windows and curtain wall.
Thus, so far we have given the relevant facts as we have found them with respect to the background of Alcoa and Cupples. The government, before trial, abandoned allegations in the complaint that the acquisition resulted in elimination of actual and potential competition between the two companies in the manufacture and sale of aluminum extrusions, the only product alleged to have been manufactured and sold by both Alcoa and Cupples. The evidence showed that Cupples' sales of extrusions were de minimis and thus not a factor. The government also abandoned its original allegation that the merger foreclosed the primary-aluminum-producer competitors from selling aluminum to Cupples.
The government's evidence was directed towards establishing that the effect of the merger may be to substantially lessen competition or to tend to create a monopoly in the following product lines of commerce:
(1) The fabrication and sale of metal curtain wall of which (2) aluminum curtain wall is a submarket and (3) the fabrication and sale of metal non-residential primary windows of which (4) aluminum non-residential primary windows are a submarket.
Section 15 U.S.C. § 18 reads in pertinent part as follows:
"No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."
The parties here agreed, and the Court so finds, that the United States as a whole is the area to be affected, therefore, the questions to be decided by this Court are
(1) what are the lines of commerce and
(2) whether the acquisition of Cupples by Alcoa may tend to lessen competition substantially or tend to create a monopoly in any of the lines of commerce in the United States.

The Line of Commerce
A considerable amount of evidence focused on the meaning of curtain wall as the government sought to establish that the term itself was used and understood in the industry as synonymous with a metal type of framework used in the construction of an exterior wall, which is non-load bearing, but is attached to and *723 supported by the structural framework of the building; while the defendants sought to show that the term curtain wall describes any non-load-bearing exterior wall. Within the antitrust dictionary "curtain wall" may be defined as an "end use".
The determination of what materials and what designs will be utilized for the construction of a building is made by the architect and the owner. While the owner's preference, if any, can be decisive, generally it is the architect who is responsible for materials and design and he must work within the owner's budget. An architect's choice of materials and design for a non-load-bearing exterior wall is based on both aesthetics and costs. His decision must be based in part on the structural framework planned, for while a heavy strong structure will permit use of materials for non-load-bearing walls of any weight, a relatively light structural framework will not permit the use of the heaviest of materials in non-load-bearing walls. Initially, architects are the focal point for suppliers of exterior wall materials  stone, brick, granite, stainless steel, bronze, aluminum, wood, corten, carbon steel and precast concrete. Metal suppliers of non-load-bearing walls seek not only to have metal specified, but seek also to have such design specifications of that material designated as will permit their advantageous bidding once the general contract has been named. One such sub-bid may be for the non-load-bearing exterior walls.
If the architect determines to have the curtain wall in metal, he may not only specify the type of metal, he may, in addition, specify metal made by Alcoa, Reynolds, Kaiser or others. Further, he may likewise specify a design of a particular fabricator and may specify the fabricators who are acceptable as bidders, such as Cupples, Kawneer, General Bronze and others. He may also have an alternative metal; but if the non-load-bearing wall is to be in metal, other materials such as precast concrete will rarely be alternatively specified. The architect may also specify the color and finish of aluminum such as Alcoa's Duranodic or Kaiser's Kalcolor. When a certain manufacturer, fabricator or color and finish has been specified, the architect usually states "or equal" to indicate that an equivalent manufacturer, fabricator, or color and finish will be acceptable.
Once the architect has completed the design, his specifications are submitted either to general contractors for bidding or a general contractor is employed on a cost-plus or fixed-fee basis to obtain sub-bids. The sub-bids obtained by the general contractor and his further negotiations thereafter with the sub-bidder form the basis of the general contractor's bid. If the architect has specified a metal design for the exterior non-load-bearing walls, usually only metal fabricators or metal assemblers will compete for the sub-contract. It is a rare instance when, for example, a precast concrete supplier will attempt to change the architect's specifications by submitting an alternative design and an alternative material of precast.
It is the foregoing general pattern of operation of the building industry in which curtain wall is sold.
Curtain wall in its broadest sense is an exterior non-load-bearing wall, which keeps out the elements and lets in light, and is attached to the structural frame-work of a building. Within its broadest meaning, it can be built of any material and its only engineering design characteristic is the fact that it is non-load-bearing.
When a metal frame is used as the basis for a non-load-bearing wall, it may be designed in a wide variety of different styles and forms and constructed of a great many different materials. The metal frame itself may be of a variety of designs. The frame may consist of (1) a series of interlocked panels, (2) a series of stacked and interlocked window frames and panels and (3) a grid system consisting of vertical structural members called mullions, to which are attached window frames. In a grid system, panels, *724 known as spandrels, frequently are used to cover the space from the lower part of the window frame or sill to the upper part of the window frame itself. The latter grid system has become a popular metal type design for it permits a wide use of a variety of materials  aluminum, porcelainized enamel, glass, etc.,  within the metal outline.
The term "curtain wall" is well understood by both Alcoa and Cupples, even though it is not precisely defined. The metal fabricators in the business consider it to be a non-load-bearing exterior wall in which metal is used as the principal framework of the system. The panels may or may not be of metal. It may or may not have mullions of metal.
In the catalogs published by Cupples before and after the merger, curtain wall was advertised. As far as Cupples is concerned, curtain wall means aluminum curtain wall.
The covering of a building is generally about five percent of the total cost of the building. There is, at the architect's level, competition between all types of building materials and particularly between precast concrete and aluminum. Both have about the same cost.
Once the architect has settled on a design for curtain wall, if it is determined to be in metal, the competition is between the various metal suppliers and fabricators. If cost is a dominant factor, aluminum is usually specified over other metals because it is cheaper than stainless steel, carbon steel, corten steel or bronze.
The metal fabricators who make curtain wall do not consider the precast concrete people to be their competitors. There is a separate trade association for metal, The National Association of Architectural Metal Manufacturers. The precast concrete suppliers are members of the Structural Clay Products Institute.
The principal product used in metal curtain wall today is aluminum. The evidence showed only two buildings using corten steel and two using bronze, one of the buildings using bronze has not been completed. Stainless steel has been used more frequently. Stainless steel in the metal line is the only real competitor with aluminum and aluminum has many advantages over stainless steel. Alcoa's study of costs shows aluminum curtain walls have an average cost of $6.26 per square foot and stainless steel an average of $9.69 per square foot. Bronze is more expensive than stainless steel.
Carbon steel requires periodic painting, aluminum does not. Aluminum may now be coated with an anodizing color process of Kalcolor or Duranodic in various shades of bronze, brown, onyx, and grey.
Because of its pliability, aluminum can be easily extruded into many forms, shapes, and sizes. This is not possible in the use of stainless steel. This very characteristic of aluminum is also a disadvantage when compared with stainless steel because it presents engineering problems of expansion and contraction not present in stainless steel. Aluminum is also more subject to acids in the atmosphere than stainless steel.
According to a survey by Alcoa, curtain wall accounted for the use of 43,231,000 pounds of aluminum in 1960 out of a total use of aluminum in architectural products of 135,723,000 pounds. This is certainly a substantial segment of commerce in the United States.
The total demand for aluminum used in curtain wall and the percentage of that demand which Alcoa supplied between 1955 and 1960 is as follows:

 Total Demand
Year in lbs. Alcoa %
1960 43,231,000 __
1959 41,594,000 30.1
1958 41,000,000 43.3
1957 38,000,000 34.6
1956 27,000,000 41.1
1955 19,000,000 58.9

The precise use of metal in curtain wall, other than aluminum, was not shown. However, it is evident from all the testimony that aluminum dominates the metal *725 curtain wall market. Alcoa's study indicated that aluminum accounts for over ninety percent of the total requirements.
This Court finds that metal curtain wall is a line of commerce and that aluminum curtain wall is a well-defined submarket therein and as such is also a line of commerce under Section 7.
In arriving at this conclusion, we must look to see what the Supreme Court has said in recent cases as it applies to the facts in this case.
In Brown Shoe Co. v. United States, 370 U.S. 294, l. c. 324, 82 S.Ct. 1502, l. c. 1523, 8 L.Ed.2d 510, the Court said:
"[D]etermination of the relevant market is a necessary predicate to a finding of a violation of the Clayton Act because the threatened monopoly must be one which will substantially lessen competition `within the area of effective competition.' Substantiality can be determined only in terms of the market affected."
and l. c. 325, 82 S.Ct. l. c. 1523, 1524:
"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for anti-trust purposes. United States v. E. I. duPont de Nemours & Co., 353 U.S. 586, 593-595. The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors. * * *"
In this case the broad outer boundaries are "curtain wall" where all types of building materials compete. Within that outer market "metal curtain wall" and "aluminum curtain wall" are meaningful product markets or "lines of commerce".
The industry recognizes "metal curtain wall" as distinct and different from precast or any other type of curtain wall. The customers are the building owners as they are guided by the architects and contractors. When an aluminum curtain wall is called for, the vendors of precast concrete, brick or stone are not called in to make a sub-bid. Only those vendors of aluminum. If some other metal is an alternate, then vendors of that metal are called into make a sub-bid.
There are specialized vendors of metal curtain wall, who deal in both steel and aluminum or in steel, bronze and aluminum. But except for one vendor, Kawneer, who also owns a concrete company which is operated as a separate unit, metal vendors do not deal in concrete and concrete vendors do not deal in metal.
Production facilities for aluminum curtain wall are unique and specialized. The extrusion presses and the hard-coat finish with color such as Duranodic or Kalcolor require special and distinct facilities to produce.
The Court pointed out in U. S. v. E. I. Du Pont & Co., 353 U.S. 586, l. c. 593, 77 S.Ct. 872, 1 L.Ed.2d 1057, that "automotive finishes and fabrics" have sufficient peculiar characteristics and uses to constitute a "line of commerce" separate and distinct from all other finishes and fabrics. So do metal curtain walls and aluminum curtain walls.
What we are really determining are the "trade realities", U. S. v. Philadelphia Nat. Bank, 374 U.S. 321, l. c. 357, 83 S.Ct. 1715, 10 L.Ed.2d 915. The line of commerce may be a broad line of commerce as outlined by the Court in United States v. Continental Can Co., 84 S.Ct. 1738, page 1747, decided June 22, 1964.
"* * * we hold that the inter-industry competition between glass and metal containers is sufficient to warrant treating as a relevant product market the combined glass and metal container industries and all *726 end uses for which they compete. * * *"
The line of commerce may be a narrow one. U. S. v. Aluminum Co. of America, 377 U.S. 271, l. c. 277, 84 S.Ct. 1283, l. c. 1287, 12 L.Ed.2d 314:
"Thus, contrary to the District Court, we conclude (1) that aluminum conductor and copper conductor are separable for the purpose of analyzing the competitive effect of the merger and (2) that aluminum conductor (bare and insulated) is therefore a submarket and for purposes of § 7 a `line of commerce.'"
What we are really finding in a line of commerce is an effective area of competition.

The Competitive Effects of the Acquisition
Who is engaged in the fabrication and erection of metal curtain wall and particularly in the use of aluminum in curtain walls?
There are more than one hundred firms ranging in size from very small firms to those of the size of Alcoa. In 1957 Alcoa's Commercial Research Division determined that eleven firms used 24,810,000 pounds of aluminum in the fabrication of curtain wall or 65.3% out of a total of 38,000,000 pounds used that year. Cupples accounted for 6,322,000 pounds or 16.6% of the total industry use.
Cupples, before the acquisition, was a leader in the fabrication and erection of aluminum curtain wall. It was in first place in 1957 with its nearest competitor in use of aluminum for curtain wall being Reynolds Aluminum Company, which used 3,400,000 pounds or 9% of the total.
The other large companies in the business as shown by Alcoa's survey are as follows:

 Largest Aluminum Curtain Wall Fabricators
 1957 
 Aluminum Use
 for Curtain % of Industry
 Walls (000 lbs.) Total 
 1st Cupples 6,322 16.6
 2nd Reynolds 3,400 9.0
 3rd Valley Metal 3,050 8.0
 4th Michael Flynn 2,640 6.9
 5th Ludman 2,021 5.3
 6th General Bronze 1,400 3.7
 7th Flour City 1,365 3.6
 8th Adams and Westlake 1,240 3.3
 9th Marmet 1,210 3.2
10th Fentron 1,150 3.0
11th Browne Window 1,012 2.7
 _____ ____
 Eleven largest
 fabricators 24,810 65.3
 All others 13,190 34.7
 ______ _____
 Total 38,000 100.0

Three of the companies engaged in the fabrication of aluminum curtain wall in 1957 are no longer in that business (Reynolds, Ludman and Browne Window). In *727 addition to those shown in the 1957 survey, the following are now substantial competitors of Cupples in aluminum curtain wall: Kawneer, Gridwall, Emrok, and Pittsburgh Plate Glass Co.
Only the large aluminum-curtain-wall fabricators have the financial resources, the engineering know-how and the experience to fabricate and erect aluminum curtain wall on large high-rise and multi-story buildings.
The smaller firms may compete successfully on the one, two and three story buildings in their own area, but beyond that they fall by the wayside in competition with the large firms.
The defendants testified that the motive of Alcoa in acquiring Cupples was to benefit the entire building industry by having Cupples perform pilot operations which would inure to the benefit of all the building industry. This may be a partial statement of their motives, but it is not a defense to a Section 7 case. See United States v. E. I. du Pont & Co., supra, 353 U.S. l. c. 607, 77 S.Ct. l. c. 884, where the Court said:
"* * * the fact that all concerned in high executive post in both companies acted honorably and fairly, each in the honest conviction that his actions were in the best interests of his own company and without any design to overreach anyone, including du Pont's competitors, does not defeat the Government's right to relief. It is not requisite to the proof of a violation of § 7 to show that restraint or monopoly was intended."
While we are examining the motive of Alcoa in acquiring Cupples, it may be well to look at a memorandum written by F. J. Close, the executive vice-president of Alcoa, on February 11, 1960, with copies to other officers of Alcoa in which he said:
"I am completely aware of the financial situation confronting us but in view of what is going on in the building trades, I believe, and I am sure Mr. Schoetz and Mr. Chase as well as others in the sales department will support my belief, that it is essential that we move rapidly to establish ourselves as the leader in this business with the ultimate objective of getting at least 40% of all the business in those items which we would manufacture in the Cupples set-up."
In view of the avowed purpose of Alcoa to get 40% of the business of aluminum curtain wall by their acquisition of Cupples, this would mean that Cupples would have to increase their 16.6% to 40% to attain this goal. Does Alcoa have the power to increase this percent in Cupples? This Court is of the opinion it does. If they have the power to do this, will they? This Court is of the opinion they will if Alcoa continues to own Cupples. If Cupples achieves 40% of the aluminum curtain wall business, it will then remove some of the smaller companies completely from this line of commerce and the larger ones will have a difficult time competing with the combination of Cupples and Alcoa.
In reaching such a conclusion, the evidence shows that by being a subsidiary company of Alcoa, Cupples enjoys many advantages not possessed by their competitors in the field. Among those advantages is the ability to obtain unlimited funds.
Cupples' indebtedness to Alcoa increased from $785,571 as of December 31, 1959, to over $10,000,000 in September of 1963. Prior to the acquisition Cupples had no difficulty in obtaining funds that they needed to expand through their parent company and through normal commercial channels. However, not to the extent which they have now obtained funds from Alcoa. For example, in 1958 Cupples Company Manufacturers, the parent of Cupples, allotted $300,000 for capital expenditures to Cupples to be used over a period of five years. Since the acquisition by Alcoa, Cupples spent $1,575,000 for expansion at St. Louis, Missouri, and Dowagiac, Michigan, and the Corona, California, plant cost $4,390,628.
Nothing would prevent Alcoa from permitting Cupples to operate on a breakeven *728 basis or even a loss basis for an extended period of time and at the same time make a profit on the aluminum sold by Alcoa to Cupples so that the overall operation would be at a profit.
The tendency of building owners is to require a guarantee on aluminum curtain wall for a period of five to twenty years.
Alcoa's financial reputation in relation to giving guarantees on large curtain wall jobs inures to the benefit of Cupples because a prospective purchaser of curtain wall would much rather have this guarantee than the guarantee of a smaller company. In addition, the reputation of Alcoa in solving engineering problems in aluminum makes a guarantee from Cupples more attractive than a guarantee from a company not affiliated with a primary producer.
The evidence shows that Alcoa now furnishes their engineering know-how and skill to Cupples, as well as to Cupples competitors, and that new developments are being promoted with all fabricators on an equal basis. While this is true at the present time, there is no assurance that in the future Cupples will not be given advance information on new developments that will render other fabricators powerless to compete with Cupples. It does not seem unreasonable that Alcoa in the future would put all the aluminum curtain wall business possible into Cupples instead of the 40% which they announced as their intention when acquiring Cupples.
Alcoa has recently started to invest in real estate projects in various parts of the United States. Included in their investments are: (1) Century City in Los Angeles  total contribution in cash and guarantees $30,200,000; (2) United Nations Plaza, New York  total contribution $6,000,000  future contribution not to exceed $4,000,000 more; (3) Kratter Corporation, New York  $1,000,000 loan; (4) Mansion House, St. Louis, Missouri  $600,000 loan; (5) Allegheny Center, Pittsburgh, Pennsylvania,  contributions, loans and guarantees $2,000,000 to $3,000,000; (6) Baychester Housing Development  loans and contributions $5,300,000; (7) Golden Gateway project, San Francisco, California  loans and contributions $2,500,000.
The purpose of these investments is to make a return on capital. It also provides a means of promoting the use of aluminum in the building industry. Only Alcoa aluminum is used in these projects where aluminum is called for. Cupples, as well as Cupples competitors, has supplied the extruded products to date in these real estate projects. Cupples could reasonably be expected to supply more of the aluminum in the future than its competitors because of the ownership of Cupples by Alcoa. In fact, if a suit was not pending it would be reasonable to find that Cupples would get all this business.
Alcoa sells aluminum to jobbers at a lower price than it sells to fabricators. The evidence is that Alcoa now sells to Cupples at the same price it sells to other fabricators. Nothing would prevent Alcoa in the future from selling to Cupples at jobber prices, which would put Cupples in an even more advantageous position than other fabricators.
Alcoa through the years has acquired a reputation with architects and builders as a pioneer in new developments. They spend large sums of money to advertise in trade magazines and on television, and in promoting expense-free trips to the home office by various persons in the trade, such as architects and builders, to show them new processes. Now, as a subsidiary of Alcoa, this prestige benefits Cupples. Cupples on its advertising and catalogs promotes itself as a subsidiary company of Alcoa.
Cupples today is the only aluminum fabricator that is owned by a primary producer, except for Amarlite Company, which was acquired in 1960 by Anaconda Aluminum Company, the smallest of the primary producers which has only 2.8% of the primary market.
Certain sizes, shapes and patterns for aluminum curtain wall are extruded from dies which are expensive and which are owned by Alcoa. At the present time these dies are made available to all of *729 Alcoa's customers, including the competitors of Cupples, provided the aluminum is purchased from Alcoa. It would be reasonable to assume this will continue as long as Cupples uses only 16% of the aluminum in curtain wall because Alcoa does not want to lose the other business. But what would Alcoa do when Cupples achieves 40% of the market? Or more than 40%? Would not Alcoa use its advantages to help Cupples and to thereby help itself? This Court is of the opinion that it would.
Duranodic finish adds a hard coat and color which makes aluminum attractive as a curtain wall material. It costs $100,000 or more to establish this process. Cupples is one of the companies licensed by Alcoa to use Duranodic. The Kalcolor licensed by Kaiser is another color process which competes with Duranodic finish. Because of its cost a small company is not able to install this process. With out color finish on aluminum, a firm cannot successfully compete in the aluminum curtain wall market.
With all of the foregoing facts, what are the tests the Court must apply in making a determination of the competitive effect of an acquisition?
In A. G. Spalding & Bros., Inc., v. F. T. C., 301 F.2d 585 (C.A.3d), l. c. 625, the Court said:
"Under Section 7 of the Clayton Act the Government is not required to show that competition has been or is being restrained or that monopoly exists. The legislation was contrived as a preventive measure to eliminate the proscribed activities before they became operative. * *
"* * * the test of a violation of § 7 is whether, at the time of suit, there is a reasonable probability that the acquisition is likely to result in the condemned restraints. * * *"
The motive in the acquisition is important. Here the purpose of acquiring 40% of the aluminum curtain wall market has been clearly expressed. In United States v. Paramount Pictures, 334 U.S. 131, l. c. 174, 68 S.Ct. 915, l. c. 937, 92 L.Ed. 1260, the Court said:
"* * * In the opinion of the majority the legality of vertical integration under the Sherman Act turns on (1) the purpose or intent with which it was conceived, or (2) the power it creates and the attendant purpose or intent. * * *"
In the Brown Shoe case, supra, 370 U.S. at page 344, 82 S.Ct. at page 1534, the Court said:
"* * * But we cannot fail to recognize Congress' desire to promote competition through the protection of viable, small, locally owned businesses. Congress appreciated that occasional higher costs and prices might result from the maintenance of fragmented industries and markets. It resolved these competing considerations in favor of decentralization. We must give effect to that decision."
In Transamerica Corp. v. Board of Governors, 206 F.2d 163, l. c. 169, the Court said:
"A monopoly involves the power to raise prices or to exclude competition when the monopolist desires to do so. Obviously, under Section 7 it was not necessary for the Board to find that Transamerica has actually achieved monopoly power but merely that the stock acquisitions under attack have brought it measurably closer to that end. For it is the purpose of the Clayton Act to nip monopoly in the bud. Since by definition monopoly involves the power to eliminate competition a lessening of competition is clearly relevant in the determination of the existence of a tendency to monopolize. * * *"
It seems to this Court, and we so find, that the acquisition of Cupples, the number one fabricator of aluminum curtain wall, with 16.6% of the aluminum curtain wall market, by Alcoa, the number one domestic producer of primary aluminum, with 36.1% of the primary aluminum market, with Alcoa's avowed *730 purpose to obtain 40% of the aluminum curtain wall market in Cupples, can reasonably be expected to substantially lessen competition or tend to create a monopoly in the fabrication and sale of metal curtain wall and aluminum curtain wall, the relevant lines of commerce within the United States. Thus, we find a violation of Section 7 of the Clayton Act.
In considering the line of commerce of metal curtain wall and aluminum curtain wall, in most instances the metal and aluminum windows are an integral part of the curtain wall system.
The Court is of the opinion on the evidence before it that there is no real or clear distinction between residential primary windows and non-residential primary windows, whether made of aluminum or other metal. The evidence shows that so-called aluminum non-residential primary windows are used in residences and that so-called aluminum residential primary windows are used in high rise apartments and other commercial buildings.
Residential and non-residential windows made of aluminum are both stocked. This may be done by stocking aluminum "sticks", which may be fabricated into a window by cutting the stick into various lengths, and fastening it together to make the outer frame of the window. Stocking the windows may also be done by keeping in stock the finished windows.
Aluminum and metal primary windows are sold by the fabricator to hardware stores, dealers who deal in lumber or other materials, contractors, builders and a variety of other purchasers. There are no distinct customers. They are not custom-made like curtain wall for a specific building.
Almost every dealer in building supplies is in the aluminum window business. To get into the business does not require the plant facilities required for curtain wall. This can be accomplished with a small shop, a few tools, and the purchase of aluminum sticks or the finished windows.
The fabrication of aluminum windows can be done with a small outlay of capital and a very few dies. There are no distinct production facilities required for either non-residential windows or residential windows.
As to the lines of commerce of metal non-residential primary windows and aluminum non-residential primary windows, the government has not met its burden of proof.
Alcoa will be ordered to divest itself of the stock of Cupples. Because of the ownership of the Corona, California, plant by Alcoa, which is being operated by Cupples, a further hearing will be held to determine the proper method and the scope of the divestiture.