■ 112 WEST 34TH STREET ASSOCIATES, LLC, Respondent, v 112-1400 TRADE PROPERTIES LLC, Appellant. [944 NYS2d 68]—

Judgment, Supreme Court, New York County (Jeffrey K. Oing, J.), entered November 7, 2011, inter alia, permanently enjoining defendant from terminating the lease or otherwise interfering with plaintiff's possession of the leased premises based on the December 2, 2008 notice to cure, and declaring

---

that plaintiff is not in default under or in breach of the lease, unanimously affirmed, with costs. Appeal from order, same court and Justice, entered September 13, 2011, upon the parties' motions for summary judgment, unanimously dismissed, without costs, as subsumed in the appeal from the judgment.

Under a 114-year triple net ground lease, dated June 10, 1963 and set to expire on June 10, 2077, defendant leased to plaintiff the land and 26-story commercial building located at 112-120 and 122 West 34th Street in Manhattan. The building, which has approximately 780,000 square feet of rentable space, was built in the 1950s and its original construction featured an aluminum and glass curtain wall system on all but the eastern facade, which had a masonry veneer wall with punched windows.

In 2006, plaintiff's managing agent reviewed the condition of the building and concluded that certain components were failing and had outlived their useful lives, and required repair or replacement. In 2007, plaintiff undertook a capital improvement program, which included, among other things, placing a new curtain wall over the old one, at a cost of approximately $16.5 million, the installation of a new canopy, and masonry work.

By notice to cure dated December 2, 2008, defendant advised plaintiff that it was in default under the terms of the lease, in that: "[i]n violation of Sections 9.01 (a) and 9.01 (b) of the Lease, you have made structural changes or alterations to the Demised Premises involving in the aggregate an estimated cost of more than one hundred thousand dollars ($100,000) (the 'Structural Alterations') without having obtained Lessor's prior written consent to such Structural Alterations and without having provided Lessor with ten days' written notice prior to undertaking such Structural Alterations."

The notice identified eight work items, including masonry work (items [a] [i] through [v]), the new canopy (item [a] [vi]), adding a pre-fabricated shed on the roof of the building (item [a] [vii]), and the new curtain wall (item [a] [viii]). Defendant also alleged that plaintiff violated section 9.01 (d) and (i) of the lease by making the structural alterations without either seeking or obtaining defendant's written approval of the project architects and/or engineers and cost estimates, and by failing to furnish a performance bond.

By summons and complaint dated January 22, 2009, plaintiff commenced this action, seeking a *Yellowstone* injunction (*see First Natl. Stores v Yellowstone Shopping Ctr.*, 21 NY2d 630 [1968]), and a declaration that it was not in default under the

lease. Plaintiff alleges that the challenged work is not structural and in any event falls within the ambit of article 7 ("Repairs and Maintenance of Demised Premises") and article 8 ("Compliance With Laws, Ordinances and Regulations"), neither of which requires the prior written consent of defendant. After granting a *Yellowstone* injunction, Supreme Court denied defendant's motion and granted plaintiff's cross motion for summary judgment. In so ruling, the court found that the interpretation of the term "structural change" presents a question of fact, and that the unrefuted affidavits of plaintiff's four experts established that the challenged work was not structural. We now affirm.

"The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent" (*Greenfield v Philles Records*, 98 NY2d 562, 569 [2002]). "When the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving practical interpretation to the language employed and the parties' reasonable expectations" (*Franklin Apt. Assoc., Inc. v Westbrook Tenants Corp.*, 43 AD3d 860, 861 [2007]).

"A lease, like any other contract, is to be interpreted in light of the purposes sought to be attained by the parties" (*Farrell Lines v City of New York*, 30 NY2d 76, 82 [1972]).

"[C]ourts are obliged to interpret a [lease] so as to give meaning to all of its terms" (*150 Broadway N.Y. Assoc., L.P. v Bodner*, 14 AD3d 1, 5 [2004] [internal quotation marks omitted]). If inconsistent clauses exist, they will be reconciled if possible and the intent of the parties enforced as expressed in the lease (*see National Conversion Corp. v Cedar Bldg. Corp.*, 23 NY2d 621, 625 [1969]). Further, "[i]t is well settled that no additional liability or requirement will be imposed upon a tenant by interpretation unless it is clearly within the provisions of the instrument under which it is claimed" (*67 Wall St. Co. v Franklin Natl. Bank*, 37 NY2d 245, 249 [1975]).

Here, the clear intention of the parties, evidenced by the language of articles 7 and 8 of the commercial triple net lease, was to transfer to plaintiff net lessee all responsibility for inspection, maintenance and repair of the building.

Section 7.01 of the lease obligates plaintiff to perform "all necessary repairs [to the Demised Premises], interior and exterior, structural and non-structural, ordinary and extraordinary or radical, foreseen and unforeseen." Section 7.02 provides that the "necessity for and adequacy of repairs . . . shall be measured by the standard which is appropriate for buildings of

similar construction and class, provided that Lessee shall in any event make all repairs necessary to avoid any structural damage or injury to the Building." Section 7.04 provides that defendant will not be required to make any repairs or alterations of any kind and that plaintiff "assumes the full and sole responsibility for the condition, operation, repair, replacement, maintenance and management of the Demised Premises." Section 7.05 provides that any dispute over the standard of care and maintenance shall be determined by arbitration in accordance with article 26.

Section 8.01 of the lease obligates plaintiff to remove all violations and to: "comply with all present and future laws, ordinances, orders, rules, regulations and requirements of all federal, state and municipal governments, courts, departments, commissions, boards and officers, any national or Local Board of Fire Underwriters, or any other body now or hereafter exercising functions similar to those of any of the foregoing, radical, foreseen or unforeseen, ordinary as well as extraordinary, which may be applicable to the Demised Premises or any part thereof, . . . whether or not any such law, ordinance, rule, regulation or requirement shall necessitate radical structural changes, additions or improvements, or the removal of any structure, encroachments or projections, ornamental or structural, on, to or over the streets adjacent to the Demised Premises, or on, to or over property contiguous or adjacent thereto."

Neither article 7 or article 8 states that the lessee must notify or obtain the lessor's consent before performing structural work required by it. The only instance where notice and the lessor's prior consent to structural work is required is found in article 9, "Changes, Alterations and New Construction by Lessee."

Under section 9.01, "Lessee shall have the right at any time and from time to time during the term hereof to make, at its sole cost and expense, changes and alterations in, to or of the Building," provided, in pertinent part:

"(a) No structural change or alteration involving in the aggregate an estimated cost of more than ONE HUNDRED THOUSAND DOLLARS ($100,000) shall be undertaken except after ten days prior written notice to Lessor.

"(b) No structural change or alteration, involving in the aggregate an estimated cost of more than ONE HUNDRED THOUSAND DOLLARS ($100,000), including any such change or alteration in connection with any restoration required by Articles 15 or 16 hereof, but excluding tenant changes in connection with the leasing of space in the Building, shall be made

without the prior written consent of Lessor, which consent Lessor shall not unreasonably withhold. . . .

"(d) Any structural change or alteration, other than tenant changes to be made to be made in connection with the leasing of space in the Building, involving in the aggregate an estimated cost of more than ONE HUNDRED THOUSAND DOLLARS ($100,000) shall be conducted under the supervision of a licensed architect or a licensed professional engineer selected by Lessee and approved in writing by Lessor (which approval Lessor shall not unreasonably withhold), and no such structural change or alteration shall be made except in accordance with detailed plans and specifications and cost estimates prepared and approved in writing by such architect or engineer and approved in writing by Lessor (which approval Lessor shall not unreasonably withhold). . . .

"(i) If the estimated cost of any such structural change or alteration shall in the aggregate be in excess of ONE HUNDRED THOUSAND DOLLARS ($100,000), Lessee shall, before commencement of work, at Lessee's sole cost and expense, furnish to Lessor a surety company performance bond."

In contrast to article 7 and 8, which impose an *obligation* on plaintiff to make structural changes and alterations where necessary for maintenance, repair or compliance with the law, article 9 addresses plaintiff's *right* to make structural changes and alterations to the building where it chooses, but is not obligated, to do so. Article 9 makes no reference to either article 7 or article 8, and its requirement of consent and notice does not apply to work undertaken pursuant to articles 7 or 8, neither of which states that notice to or consent of the lessor must be obtained before the work is done. Thus, the clear meaning of the lease, read as a whole, is that notice to, and consent of, the lessor is required only with respect to work that (1) constitutes a structural change or alteration to the building; (2) costs more than $100,000 in the aggregate; and (3) is not a repair, or required to comply with the law, or a tenant change in connection with the leasing of space.

Defendant argues that whether work is structural or not presents a question of law, not fact, and that, notwithstanding the opinions of plaintiff's four experts, the masonry work and installation of the curtain wall, canopy, and a new entranceway were structural alterations under the well settled legal definition of that term, which encompasses a change to "a vital and substantial portion of the premises, [that] would change its characteristic appearance" and is "extraordinary in scope and effect, or unusual in expenditure" (*see Wall Nut Prods. v Radar*

*Cent. Corp.*, 20 AD2d 125, 126-127 [1963]; *see also Two Guys from Harrison-N.Y. v S.F.R. Realty Assoc.*, 63 NY2d 396, 400 [1984]; *Riverside Research Inst. v KMGA, Inc.*, 108 AD2d 365, 369 [1985], *affd* 68 NY2d 689 [1986]). However, "what will constitute a structural alteration necessarily depends upon the facts of each case and requires that the nature and extent of the proposed repair or alteration be examined in the context of and in relationship to the structure itself" (*Garrow v Smith*, 198 AD2d 622, 623 [1993]; *see also Excell Assoc. v Excelsior 57th Corp.*, 2011 NY Slip Op 32117[U] [Sup Ct, NY County 2011]).

Here, plaintiff's unrefuted expert testimony establishes that the structure of a building is its "load bearing skeleton," which means its "foundation, floor slabs, beams and columns" (*see also* Administrative Code of City of NY § 27-585), and that "a structural change or alteration" is one that would "alter or change the Building's skeleton or impact on its integrity." The experts opined that the masonry repairs made to a parapet wall and non-weight-bearing brickwork (work items [a] [i] through [a] [v]) were not structural repairs (*see also Bertsch v Small Invests., Inc.*, 4 NJ 520, 524, 73 A2d 346, 348 [1950] [removal or replacement of a parapet "could affect only slightly the general appearance of the edifice"]). The experts did not regard the construction of a steel canopy (work item [a] [vi]) in front of the building as a structural change since the non-weight-bearing canopy "simply hangs from the building." The cases that defendant relies on to support its contention as to the canopy are distinguishable (*see e.g. Two Guys*, 63 NY2d at 400 [extending existing sign canopy required piercing waterproofing membrane of roof]). The roof shed work (work item [a] [vii]) was never done.

All four of plaintiff's experts stated that the recladding of the curtain wall (work item [a] [viii]) was not a structural change (*see* NY City Building Code [Administrative Code of City of NY] § 1402.1 [defining a curtain wall as "a non-load bearing building wall, in skeleton frame construction attached and supported to the structure at every floor or other periodic locations. Assemblies may include glass, metal, precast concrete or masonry elements arranged so as not to exert common action underload and to move independently of each other and the supporting structure"]; *see also Village of Cross Keys, Inc. v United States Gypsum Co.*, 315 Md 741, 746, 556 A2d 1126, 1128 [1989] ["A curtain wall is not a part of the structural skeleton of the building"]; *United States v Aluminum Co. of Am.*, 233 F Supp 718, 723 [D Mo 1964], *affd* 382 US 12 [1965] [curtain wall "keeps out the elements and lets in light, and is attached to the

structural framework of a building"]). As the facade, it could be removed without affecting the building's structural integrity.

Defendant failed to rebut plaintiff's showing that the challenged work was not structural. Defendant essentially argues that the work was structural because it was extensive and expensive and changed the appearance of the building. However, as plaintiff argues, this ignores the length of the lease, the value of the lease and the related value of the work, the parties' understanding of how the premises were to be repaired and maintained, and whether the conduct of the work will upset the reasonable expectations of the landlord as to the condition of the premises that will revert back to it at the end of the tenancy. The new curtain wall replaced the existing curtain wall and updated, but did not change, the building's characteristic appearance, the fundamental purpose of its erection, or its contemplated uses. While defendant claims that plaintiff undertook an "$80 million top-to-bottom capital improvement program at the Building," the work items raised in the notice to cure were estimated to cost no more than $22 million, which must be viewed in the context of a 26-story, 780,000-square-foot building that costs approximately that amount to maintain each year. Nor does the mere fact that plaintiff hired structural engineers to determine the weight load and whether the building could bear the new curtain wall render the work structural.

Given our finding that the challenged work was not structural, we need not consider plaintiff's alternative argument that the work is governed by articles 7 and 8 of the lease and therefore did not require the landlord's prior consent.

Defendant's arguments as to work items that were not included in the notice to cure, such as the alleged new entranceway, will not be considered (see Chinatown Apts. v Chu Cho Lam, 51 NY2d 786, 787-788 [1980]). Concur—Tom, J.P., Andrias, Catterson, Moskowitz and Román, JJ.