**MT. LEBANON MOTORS, INC., Plaintiff,**

**v.**

**CHRYSLER CORPORATION and Chrysler Motors Corporation, Defendants.**

Civ. A. No. 64–1137.

United States District Court
W. D. Pennsylvania.

May 1, 1968.

Louis C. Glasso and Gerald Ziskind, Pittsburgh, Pa., for plaintiff.

Edmund K. Trent, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for defendants.

## OPINION

DUMBAULD, District Judge.

In the case at bar plaintiff, a Dodge dealer, whose franchise was terminated by Chrysler [1] on January 31, 1964, effective ninety (90) days thereafter, sues for damages under 15 U.S.C. § 1222 which provides:

> "An automobile dealer may bring suit against any automobile manufacturer engaged in commerce, in any district court of the United States in the district in which said manufacturer resides, or is found, or has an agent, without respect to the amount in controversy, and shall recover the damages by him sustained and the cost of suit by reason of the failure of said automobile manufacturer from and after August 8, 1956 to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer: *Provided,* That in any such suit the manufacturer shall not be barred from asserting in defense of any such action the failure of the dealer to act in good faith."

---

1. We refer to both defendants, as the context may require, as "Chrysler". The evidence shows that on November 1, 1956, Chrysler Corporation ceased to deal directly with retail dealers, but began the policy of selling its vehicles directly at the source to its wholly-owned subsidiary Chrysler Motors Corporation, which took over the sales agreements with dealers and thereafter handled all sales and distribution matters. Both defendants fall within the definition of "automobile manufacturer" in 15 U.S.C. § 1221(a).

The term "good faith" is defined in 15 U.S.C. § 1221 as follows:

"(e) The term 'good faith' shall mean the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: *Provided*, That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith."

■ It has been judicially determined that the words "fair and equitable" do not here have the meaning that they might have in Price Control legislation during the Second World War or in a railroad reorganization. See 11 U.S.C. § 621; Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 115, 60 S.Ct. 1, 84 L.Ed. 110 (1939); Yakus v. United States, 321 U.S. 414, 420, 64 S. Ct. 660, 88 L.Ed. 834 (1944). The legislative history indicates that they are to be interpreted in the context of coercion, arising from the inequality of bargaining power between the oligopolistic automobile industry and the local dealer with less formidable economic power. Milos v. Ford Motor Co., 317 F. 2d 712, 715, 7 A.L.R.3d 1162 (C.A.3, 1963). Violation of the Act as thus construed requires a wrongful demand which will result in sanctions if not complied with. Termination of a franchise is a severe sanction; and if inflicted for wrongful reasons would subject the manufacturer to liability under the statute. Berry Brothers Buick, Inc. v. General Motors Corp., 257 F.Supp. 542, 546 (E.D.Pa., 1966), aff'd 377 F.2d 552 (C.A.3).

■ Plaintiff's cancellation was purportedly for inadequate sales performance. The termination notice was limited to asserted breach of contract for failure to meet his fair share of minimum sales responsibility (MSR) in the local automobile market. Testimony indicated that in fact other factors were considered by the company. Mere breach of contract by the dealer does not necessarily relieve the manufacturer of liability under the statute, whose very purpose was to afford protection against undue bargaining power on the part of the automobile makers. Furthermore, failure to meet MSR does not *per se* prove inadequate or unsatisfactory sales performance, in view of the criteria for determining MSR and a dealer's fair share thereof. Testimony indicates that sometimes more and sometimes less than 50% of dealers fall below the prescribed figure. See Madsen v. Chrysler Corp., 261 F.Supp. 488, 492, 506 (N.D.Ill.E.D.1967).

■ It is a jury question whether Chrysler's action was motivated by honest business judgment or by personal animosity against plaintiff's president Samuel A. Liberto because of his prominent part in promoting opposition by privately-financed dealers to the operation of "factory stores" or for other insufficient reasons.

In addition to alleged violation of the so-called Automobile Dealers' Day in Court Act, the complaint also alleged, pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15), violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2), as well as discrimination between purchasers in violation of the Robinson-Patman Act (15 U.S.C. § 13), besides violation of Section 7 of the Clayton Act (15 U.S.C. § 18).[2] In advance of the trial defendant moved to limit the issues at trial by striking out plaintiff's claims other than under the Automobile Dealers' Day in Court Act. The Court granted the motion to strike the claim under 15 U.S.C. § 18 for the reason that that claim simply was based upon the formation of separate corporations for each dealership in which Chrysler held some or all of the stock; and this technique appeared to be a normal practice

---

2. An additional tort claim for fraudulent misrepresentation was withdrawn by plaintiff.

of causing the formation of subsidiary corporations as expressly permitted by Section 7 of the Clayton Act (15 U.S.C. § 18) rather than a forbidden merger or acquisition affecting competition in the usual antitrust sense.

Ruling on the other claims was deferred until renewal at the close of plaintiff's evidence by defendants' motion for directed verdict. At this time the Court denied the motion with respect to the Sherman Act counts, but granted the motion with respect to the Robinson-Patman Act count.

The gist of plaintiff's case is that Chrysler, beginning in 1962, established a number of dealerships which were either wholly owned and financed by Chrysler (denominated "contractual dealers") or substantially owned and controlled by Chrysler, the manufacturer holding 75% of the stock in the dealership corporation, and the so-called "dealer enterprise" (DE) dealer, who managed the dealership and was also paid a salary by the dealership corporation, 25% of the stock of the dealership corporation. In a later refinement of this method, Chrysler would loan to the DE dealer half of the 25% investment.

Plaintiff offered evidence tending to show that the Chrysler-financed dealerships, commonly called "factory stores", engaged in price-cutting and massive advertising, to the detriment of privately-financed dealerships in the Pittsburgh area, which were not able to afford advertising on such a large scale or to accept profits as small as those obtained by the factory stores in their deals with customers.

Plaintiff's proof tended to show that the factory stores consistently lost money and were unprofitable; but that from time to time, when circumstances required, Chrysler would make gifts or additional investments in the form of "capital contributions" to the factory-financed dealerships, thus enabling them to continue in business, notwithstanding their losses resulting from their normal operations.

There was also evidence that the "dealer enterprise" division of Chrysler would from time to time furnish temporary employees to the factory stores when they experienced a shortage of adequate personnel and would furnish assistance to the factory stores in establishing their accounting systems and would also furnish substantial advertising allowances in launching the new dealerships.

■ However, the testimony showed that the automobiles sold to factory stores by the manufacturer were sold at the same price and upon the same terms as those sold to the privately-financed dealerships. Thus the Court was convinced that there was no discrimination violative of the Robinson-Patman Act; but that the grievance complained of by the private dealers was simply the existence and predatory practices of the factory stores. In other words there were arguable antitrust questions with respect to whether the degree of forward integration being practiced by the manufacturer in competing with its own customers was permissible or impermissible, and whether the manner in which such competition was carried on constituted a classical case of predatory competition by price-cutting to eliminate competition, with losses being subsidized by adventitious advantages unrelated to the competitive merits of the respective contestants in the particular market.

Thus whatever evils may be shown to exist arise simply from the fact that the factory is engaging in direct competition with its customers and do not arise from any forbidden price-discrimination between any of the dealerships. With respect to price-discrimination, all dealerships are treated equally; plaintiff's disadvantage arises from the fact that some of the competing dealerships are owned by the manufacturer and subsidized from adventitious sources, allegedly the profits made at the manufacturing level. Plaintiff contends that it would be profitable to Chrysler to sell cars even at a loss at the retail level, because the manufacturing profits would be greater than the

retail losses. Cf. Southern Blowpipe & Roofing Co. v. Chattanooga Gas Co., 360 F.2d 79, 81 (C.A.6, 1966).

As the Court said in United States v. Aluminum Co. of America, 233 F.Supp. 718, 727–728 (E.D.Mo.1964): "Nothing would prevent Alcoa from permitting Cupples to operate on a break-even basis or even a loss basis for an extended period of time and at the same time make a profit on the aluminum sold by Alcoa to Cupples so that the overall operation would be at a profit." See also Reynolds Metals Co. v. FTC, 114 U.S.App.D.C. 2, 309 F.2d 223, 229 (1962).

We therefore ruled out the Robinson-Patman count.

■ Upon renewal of defendants' motions at the close of all the evidence, we adhere to the view that a jury question is presented with respect to whether or not Chrysler has violated Section 1 of the Sherman Act, which provides that: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal" (15 U.S.C. § 1).

We are satisfied that there is no problem with respect to finding the existence of a contract, combination, or conspiracy.

Chrysler Corporation manufactures motor vehicles and sells them at the source to its wholly owned subsidiary Chrysler Motors Corporation. Chrysler Motors Corporation enters into contracts, designated sales agreements, with each franchised dealership, which is a separate corporation. In the case of factory stores, whether wholly owned or under the DE plan, Chrysler Motors Corporation owns stock, and designates directors, and controls the activities of the dealership to the extent provided in the sales agreement. Chrysler Motors Corporation also seeks out and engages individuals to act as manager of the factory stores and enters into contractual agreements with them, including in some cases special provisions for bonus in addition to the salary paid as manager of the factory store.

■■ While there is no occasion in the case at bar to go so far as to attempt to find a "bathtub conspiracy" between a corporation and its own employees, it seems clear that here there are a sufficient number of separate legal persons, both individual and corporate, to constitute a combination or conspiracy. Corporate affiliation or common ownership does not insulate against liability for violation of the antitrust laws. United States v. Yellow Cab Co., 332 U.S. 218, 227, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947); Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 340 U.S. 211, 215, 71 S.Ct. 259, 95 L.Ed. 219 (1951); Timken Roller Bearing Co. v. United States, 341 U.S. 593, 597–598, 71 S.Ct. 971, 95 L.Ed. 1199 (1951).

■ Turning to the substantive question as to the nature of the restraints forbidden by Section 1, it is to be noted that since the famous decision in the Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 63–64, 31 S.Ct. 502, 55 L.Ed. 619 (1911), the Act has been interpreted as if the word "unreasonable" were inserted before the word "restraint". Subsequently the "rule of reason" has been modified by the development of rules declaring certain restrictive practices to be unreasonable restraints *per se*. These *per se* violations include, for example, price-fixing, resale price maintenance enforced by concert of action without the benefit of statutory legitimization, euphemistically sometimes referred to as "fair trade" laws, concerted boycotts or refusal to deal, secondary boycotts, or tying a patent to the use of unpatented materials. See United States v. Columbia Steel Co., 334 U.S. 495, 522, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948).

■ We are aware of no authorities indicating that the facts alleged in the case at bar would constitute a violation *per se.* They may well, however, support a charge of unreasonable restraint. Chrysler's forward integration somewhat resembles the "sheet squeeze" employed by Alcoa. United States v. Aluminum

Co. of America, 148 F.2d 416, 436–437 (C.C.A.2, 1945). Moreover, they do appear to present a jury question as to whether there has been an unreasonable restraint of trade of the classical pattern engaged in by the Standard Oil Company which may have contributed to the enactment of the Sherman Act. Predatory price-cutting in one locality, subsidized by adventitious resources, for the purpose of eliminating competition and then presumably raising prices to a non-competitive level, constitutes a classical example of restraint of trade.

The adventitious advantage, unrelated to the competitive merits of the competing sellers in the market involved, may be of a geographical nature, as where a large national company cuts prices in a limited local geographical area; or the adventitious advantage may be derived from profits obtained in a different line of commerce, as in the case of the conglomerate mergers which are so popular today.

A good illustration of predatory competition is found in the often-cited case Porto Rican American Tobacco v. American Tobacco Co., 30 F.2d 234, 236 (C.C.A. 2, 1929), where the American Tobacco Company reduced the price of Lucky Strike cigarettes in Porto Rico to penalize a local Porto Rican company for having failed to lobby against a tax increase on cigarettes imposed by the Porto Rico legislature. Here it was clear that the defendant's local price-cutting was not motivated by honestly industrial reasons, or any normal business purpose, but primarily in order to cause loss of business to a competitor. See United States v. Columbia Steel Co., 334 U.S. 495, 527, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948); Union Leader Corp. v. Newspapers of New England, 180 F.Supp. 125, 139–141 (D.Mass., 1945); McIntire v. William Penn Broadcasting Co., 151 F.2d 597, 600 (C.C.A.3, 1945).

To eliminate competition by putting out of business one dealer after another individually, by excluding competitors from any substantial market, constitutes a restraint of trade, even if there is no general effect upon the economy as a whole. International Salt Co. v. United States, 332 U.S. 392, 396, 68 S.Ct. 12, 92 L.Ed. 20 (1947); Klor's, Inc. v. Broadway-Hale Stores, 359 U.S. 207, 213, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959).

In determining whether or not price-cutting is predatory, the size of the companies involved is material. If the price-cutter is a small, obscure company, seeking to meet the competition of a large, well-known and nationally established producer, it is natural and appropriate that its price will be somewhat lower than those of the well-advertised competitor. Such a price differential is necessary in order to obtain business, in view of the predilection of purchasers for a well-known and highly advertised product. Even the private brands of large department stores sell for less than the advertised brands. For example "Macy's Own" or "Gimbel's Own" yellow mouth wash would sell for something less than Listerine. On the other hand, if it is the large, well-established company which engages in price-cutting, there is more ground for scrutinizing the facts with suspicion to determine whether a predatory or monopolistic purpose is involved.

It is also important to determine whether the price-cutter possesses an adventitious or meretricious advantage, unrelated to competitive merits, either by reason of doing business in a multi-territorial market, where the local price-cutting can be recouped by monopolistic profits elsewhere, or by reason of being able to subsidize losing operations by the profits from a different line of commerce. A good example of the former situation is found in Moore v. Mead's Fine Bread Co., 348 U.S. 115, 75 S.Ct. 148, 99 L.Ed. 145 (1954), where the plaintiff was forced out of business by a price war in the town of Santa Rosa, New Mexico, where the defendant cut prices, while maintaining higher prices in other towns in New Mexico and Texas (348 U.S. at 116, 75 S.Ct. 148). A good example of the conglomerate situation is

found in F.T.C. v. Procter & Gamble Co., 386 U.S. 568, 575, 87 S.Ct. 1224, 18 L.Ed. 2d 303 (1967), involving invasion of the liquid bleach market by a strong company engaged in the detergent-soap-cleanser business.

Another illustration of the conglomerate type of adventitious advantage is found in Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 611, 73 S.Ct. 872, 97 L.Ed. 1277 (1953), where a newspaper was charged with exploiting its monopolistic position in the morning newspaper field to strengthen its position in the competitive evening newspaper field by requiring advertisers to accept a "package deal" comprising insertion in both morning and evening papers.

A similar policy underlies the prohibitions in the transportation field directed against control of air lines by surface carriers, and the limitations upon control of motor or water carriers by railroads.

■ Turning to the charges under Section 2 of the Sherman Act, it must be noted that that section specifies not one but three offenses. The section provides "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states, or with foreign nations, shall be deemed guilty of a misdemeanor" (15 U.S.C. § 2). Monopolization, attempt to monopolize, and conspiracy to monopolize are separate offenses.

■ Monopolizing is judicially defined as acquiring or maintaining dominant market control, with the power to raise or fix prices at a non-competitive level or to exclude or eliminate competitors from the market. American Tobacco Co. v. United States, 328 U.S. 781, 809–815, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); United States v. Griffith, 334

U.S. 100, 105–107, 68 S.Ct. 941, 92 L.Ed. 1236 (1948).

There is considerable discussion in the cases regarding the "relevant market" in situations involving Section 2. To begin with the section itself speaks of monopolizing "any part of the trade or commerce among the several States, or with foreign nations." It has long been held that "The commerce referred to by the word 'any part,' construed in the light of the manifest purpose of the statute, has both a geographical and a distributive significance; that is, it includes any portion of the United States and any one of the classes of things forming. a part of interstate or foreign commerce." Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 61, 31 S.Ct. 502, 516, 55 L.Ed. 619 (1911). Thus trade in a particular geographical area or in a particular article of commerce is sufficiently identifiable as a "part" capable of being restrained or monopolized.[3]

■ Thus commerce in Dodge automobiles at the retail level in Allegheny County is a sufficiently identifiable "part" of interstate commerce to be susceptible of restraint or monopolization. United States v. Klearflax Linen Looms, 63 F.Supp. 32, 39 (D. Minnesota, 1945). The Klearflax case illustrates the distinction between the natural and inevitable monopoly of any manufacturer over its own goods at the manufacturing level and the monopolizing of the business of retail selling of such goods on the retail level. The case also indicates that an unlawful restraint may exist with respect to a particular type of product, indeed the product produced by a single manufacturer.

United States v. General Motors Corporation, 121 F.2d 376, 400 (C.A. 7, 1941) contains another clear elucidation of the distinction between the trade and commerce of the manufacturer at the

3. United States v. Johns-Manville Corp., 231 F.Supp. 690, 701 (E.D.Pa., 1964) indicates that it is the concept of market domination which necessitates determination of the market, rather than the words "any part" in Section 2 of the Sherman Act. See also Donald F. Turner, Antitrust Policy in the Cellophane Case, 70 Harv.L.Rev. 281, 294.

manufacturing level and that of the dealers in General Motors automobiles at the retail level, and holds that the latter is susceptible of illegal restraint by the manufacturer.

Likewise it was long ago held in O'Halloran v. American Sea Green Slate Co., 207 F. 187, 193–194 (D.C.1913) that "Sea Green Slate" is a specifically identifiable commodity, susceptible of restraint or monopolization, even if it meets competition from black slate from Pennsylvania and Maine and other places, and also a variety of other roofing materials.

Similarly it has been held by this Court that Pennsylvania crude oil is of a particular quality and is distinguishable from other oils. United States v. Pennzoil Co., 252 F.Supp. 962, 973 (W.D.Pa. 1965).

■ The essence of monopoly being power to control prices and exclude competition, Lessig v. Tidewater Oil Co., 327 F.2d 459, 474 (C.A. 9, 1964), there may exist situations in which such power cannot be effectively established if fungible substitute products are available in the market. United States v. E. I. Du Pont De Nemours & Co., 351 U.S. 377, 392–395, 76 S.Ct. 994, 100 L.Ed. 1264 (1956), This would seem to be the situation in the case at bar.

■ Product differentiation through advertising, styling, and other features is common in the automobile industry. There has been testimony in the case indicating that much of the business of a dealership consists in selling new cars of the same make to loyal customers. It is common knowledge, however, that there is a limit to the brand loyalty of automobile purchasers. When cheap and available transportation is made available through a competitive product, it is certain that many purchasers will deviate from their traditional loyalty to particular brands. This is illustrated by the experience of Henry Ford in introducing the original "tin Lizzie" and also by the large sale of compact foreign cars such as Volkswagen and Volvo.

■ Thus it seems clear that no effective price control by Chrysler or exclusion of competition, amounting to monopolization, could be effective in the Allegheny County market in face of the competition of General Motors, Ford, and other manufacturers. The brand loyalty of Dodge owners would undoubtedly dissipate in the face of price increases to a monopolistic level. No successful monopolizing of the Allegheny County Market for Dodges could be achieved without collusive or coercive arrangements to render ineffective the competition of other makes, and no evidence of any such arrangements is in the record in the case at bar. We therefore must grant the motion for directed verdict with respect to the charge of monopolizing, under Section 2.

■ With respect to the second offense under Section 2, attempt to monopolize, the situation is different. Here "The acts of attempted monopolization condemned by § 2 of the Sherman Act are those performed with the specific intent to unlawfully monopolize, but falling short of the goal." United States v. Charles Pfizer & Co., 245 F.Supp. 737, 739 (E.D.N.Y.1965). As there said: "The gravamen of attempt is the specific intent to commit an illegal act, but falling short of completion."

■ "Because the antitrust laws strike equally at nascent and accomplished restraints of trade, monopolistic designs as well as results are reached by the prohibitions of the Sherman Act." Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 622–623, 73 S.Ct. 872, 888, 97 L.Ed. 1277 (1953).

An attempt is, as the term indicates, a conative effort to achieve a result. The mere failure to succeed, or the impossibility of success, does not negative an attempt. When the Memorial Day races are held in Indianapolis, there is only one victor, but all the entrants attempt to win.

■. The mental or volitional element is significant in the case of an attempt. Specific intent is a necessary

ingredient of an attempt when the acts performed fall short of the results condemned by the Act. United States v. Griffith, 334 U.S. 100, 105, 68 S.Ct. 941, 92 L.Ed. 1236 (1948); Lorain Journal Co. v. United States, 342 U.S. 143, 153, 72 S.Ct. 181, 96 L.Ed. 162 (1951); Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 626, 73 S.Ct. 872, 97 L.Ed. 1277 (1953). Cf. the comments of Judge Learned Hand in United States v. Aluminum Co. of America, 148 F.2d 416, 431–432 (C.C.A. 2, 1945).

■■ Likewise with respect to the third offense under Section 2 of the Sherman Act, conspiracy to monopolize, intent, as evinced in concerted action, rather than possibility of success, is the crucial factor. For this offense the existence of a conspiracy is essential; whereas the cognate offenses of monopolizing or attempting to monopolize can be performed unilaterally by a single party. Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 709, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962).

■■ Intent,[4] as well as conspiracy,[5] may properly be inferred from circumstantial evidence and acts performed, as well as from explicit declarations of purpose or words uttered by the parties involved. What has been said previously with respect to the adequacy of proof of combination between separate legal persons under Section 1 of the Act is also applicable with respect to the charge of conspiracy under Section 2.

■ Accordingly, the motion for directed verdict will be denied with respect to the charges of attempt to monopolize and conspiracy to monopolize.

---

4. In United States v. Columbia Steel Co., 334 U.S. 495, 525, 68 S.Ct. 1107, 1123, 92 L.Ed. 1533 (1948) the Court said: "When a combination through its actual operation results in an unreasonable restraint, intent or purpose may be inferred; even though no unreasonable restraint may be achieved, nevertheless a finding of specific intent to accomplish such an unreasonable restraint may render the actor liable under the Sherman Act." See also Utah Pie Co. v. Continental Baking Co., 386 U.S. 685, 696–697, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967).

5. "No formal agreement is necessary to constitute an unlawful conspiracy. Often crimes are a matter of inference deduced from the acts of the person accused and done in pursuance of a criminal purpose. Where the conspiracy is proved, as here, from the evidence of the action taken in concert by the parties to it, it is all the more convincing proof of an intent to exercise the power of exclusion acquired through that conspiracy. The essential combination or conspiracy in violation of the Sherman Act may be found in a course of dealing or other circumstances as well as in an exchange of words. United States v. Schrader's Son, 252 U.S. 85, [40 S.Ct. 251, 64 L.Ed. 471]. Where the circumstances are such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding or a meeting of minds in an unlawful arrangement, the conclusion that a conspiracy is established is justified." American Tobacco Co. v. United States, 328 U.S. 781, 809–810, 66 S.Ct. 1125, 1139, 90 L. Ed. 1575 (1946).