**MARTIN B. GLAUSER DODGE CO., Plaintiff,**

v.

**CHRYSLER CORPORATION et al., Defendants.**

Civ. A. No. 1077–70.

United States District Court, D. New Jersey.

Aug. 20, 1976.

Morris L. Chucas, Cherry Hill, N. J., for plaintiff.

Pelino, Wasserstrom, Chucas & Monteverde, Morris L. Chucas, by Tom P. Monteverde, Philadelphia, Pa., of counsel, for plaintiff.

Archer, Greiner & Read, by John P. Hauch, Jr., Haddonfield, N. J., for Chrysler Corp., Chrysler Motors Corp. and Chrysler Realty Corp., defendants.

Farr, Reifsteck, Wolf & Crabtree, by William E. Reifsteck, Haddon Heights, N. J., for Chrysler Financial Corp. and Chrysler Credit Corp., defendants.

Drinker, Biddle & Reath, by Robert S. Ryan, Michael O'S. Floyd, Philadelphia, Pa., of counsel, for all defendants.

## ON MOTIONS FOR JUDGMENT NOTWITHSTANDING THE VERDICT OR NEW TRIAL.

### OPINION

COHEN, Senior District Judge.

Defendants have moved for judgment notwithstanding the verdict or alternatively a new trial, following an adverse jury verdict in this private antitrust action brought pursuant to section 4 of the Clayton Act, 15 U.S.C. § 15.[1] The jury found that the defendants entered into a combination or conspiracy in unreasonable restraint of trade or commerce in violation of section 1 of the Sherman Act, 15 U.S.C. § 1,[2] causing injury to the plaintiff in the amount of 1.3 million dollars. This award was later trebled by the court to 3.9 million dollars. In support of these post-trial motions defendants assert three grounds. First, defendants con-

---

1. 15 U.S.C. § 15 provides: Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover three-fold the damages by him sustained, and the cost of the suit, including a reasonable attorney's fee.

2. 15 U.S.C. § 1 provides in relevant part: Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal. . .

tend that the plaintiff's theory of liability and method of computation of damages were invalid. Next, it is argued that the evidence insufficient to support a finding that any of the defendants violated section 1 of the Sherman Act. Finally, defendants maintain that trial errors and infirmities in the court's charge warrant a new trial. For the reasons discussed below, the motions will be denied.

■ The central question presented here is whether and to what extent an automobile manufacturer may subsidize its partially owned dealers without providing similar assistance to independent dealers. More specifically the issue is whether the defendants' implementation of a vertically integrated distribution system had the effect of reducing intrabrand competition so as to violate section 1 of the Sherman Act. On motion for judgment notwithstanding the verdict pursuant to Fed.R.Civ.P. 50(b) the court is required to accept the evidence and all reasonable inferences in the light most favorable to the plaintiff. *Continental Ore Co. v. Union Carbide*, 370 U.S. 690, 696, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); *Tennant v. Peoria & P.U. Ry.*, 321 U.S. 29, 35, 64 S.Ct. 409, 88 L.Ed. 520 (1944); *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1344 (3rd Cir.1975); *Denneny v. Siegel*, 407 F.2d 433, 439 (3rd Cir.1969). Plaintiff, Martin B. Glauser Dodge Co. (Glauser Dodge) is a family owned New Jersey corporation which operated an automobile dealership in Vineland, New Jersey. Between February, 1964 and July, 1970 Glauser Dodge and its predecessor proprietorship owned by Martin B. Glauser sold and serviced new Dodge automobiles and trucks pursuant to a franchise agreement with Chrysler Motors; and in addition sold used cars.

Chrysler Motors Corporation is a wholly owned subsidiary of Chrysler Corporation engaged in distribution. Chrysler Credit Corporation, which is a wholly owned subsidiary of Chrysler Financial Corporation, extends wholesale credit to and purchases retail installment contracts from Chrysler dealers. Chrysler Financial Corporation, in turn, is a wholly owned subsidiary of Chrysler Corporation and is the source of capital for the entire Chrysler financial operation. Chrysler Realty, also a wholly owned subsidiary of Chrysler Corporation, acquires, develops, and administers property for Chrysler dealer sites.

In an attempt to increase its overall market penetration Chrysler Corporation developed a Dealer Enterprise (DE) program. The major tenets of this marketing program are revealed in what has been identified as the "Quinn Memorandum,"[3] The program envisioned the resurrection of Chrysler's dealership system through the infusion of venture capital to be provided in large part by Chrysler itself. As the Quinn Memorandum points out, outside investors did not find automobile dealerships in general, and Chrysler Corporation in particular, sufficiently attractive to provide the necessary venture capital. The money provided was to be used in three general areas: capitalization, facilities, and launching costs. The following practices, *inter alia*, were recommended:[4]

1. Acquisition of existing facilities and leasing to operator;

2. Mortgage on existing facilities;

3. Sponsorship of capital loan program through finance companies whereby finance companies administer and Chrysler Corporation assumes partial financial responsibility;

4. Assumption of lease or guarantee of lease on existing facilities or facilities to be constructed; and

5. Use of contractual start up plan in relation to assumption of operating losses by Chrysler Corporation for a specified ·period. . . .

Under the Dealer Enterprise plan Chrysler supplied up to 75% of the capital needed to finance a new dealership. The 25% owner

---

**3.** The "Quinn Memorandum" refers to a report, written in 1961 by Mr. E. C. Quinn, Sales Vice-President for Chrysler, entitled "Market Representation Program." Exhibit P–7.

**4.** Exhibit P–7, at 9.

became manager of the dealership and could ultimately purchase the stock held by Chrysler out of his share of the profits. Until that time, however, Chrysler retained majority control. The program consistently produced net operating losses at the dealer level, but greater market penetration and the resulting increases in production permitted more efficient utilization of manufacturing facilities. Thus, as was explained by plaintiff's expert, Dr. Kuehn, the retail losses were offset by increased profits at the manufacturing level. This pattern of operating losses at the retail level, experienced by DE dealers nationally, was also reflected by the four Camden area Dodge DE dealers which were in competition with the plaintiff.

The essence of plaintiff's antitrust claim is that the Dealer Enterprise marketing program operated in a discriminatory fashion vis-a-vis private capital dealers. There was evidence adduced at trial to show that: (1) Cars were advertised and sold through DE dealers at prices which were lower than private capital dealers, such as the plaintiff, could afford to charge. (2) Superior physical facilities were provided to DE dealers on terms which were not available to competing private capital dealers. (3) DE dealers were permitted to sell retail installment contracts to Chrysler Credit Corporation on a without recourse basis, whereas plaintiff was required to guarantee to repurchase defaulted retail installment contracts of its customers. (4) DE dealers were permitted to operate in an out-of-trust condition when experiencing cash flow problems, whereas plaintiff's credit was immediately revoked when it was out of trust. (5) Restrictions on plaintiff's wholesale lines of credit, as well as its inability to sell its commercial retail paper without recourse, precluded plaintiff from participating in revenue-producing sales contests to the same degree as DE dealers. (6) Plaintiff did not receive the new vehicles it had ordered for its 1969 opening, even though an ample number of such vehicles were delivered to the DE dealers in the Camden area.

The jury returned the following verdict in response to special interrogatories:

1. Did any of the defendants enter into any combination or conspiracy in unreasonable restraint of trade or commerce? Yes or no.

ANSWER: *Yes.*

2. If your answer to question 1 is yes, then which defendants did combine or conspire?

ANSWER: *Chrysler Corporation, Chrysler Motors Corporation, Chrysler Financial Corporation, Chrysler Credit Corporation, Chrysler Corporation.*

3. If your answer to question number 1 is yes, then was the plaintiff, Glauser Dodge Co. injured as a proximate result of such combination or conspiracy?

ANSWER: *Yes.*

4. If your answers to questions 1 and 3 are yes, state the amount of damages?

ANSWER: *1.3 million dollars.*

## I. RESTRAINT OF TRADE

■ Defendants contend that the evidence at trial was legally insufficient to support a finding that any defendant combined or conspired in unreasonable restraint of trade or commerce in violation of section 1 of the Sherman Act. The plaintiff does not assert that the mere existence of Chrysler's Dealer Enterprise program constituted a violation of the Act. Rather, the "rule of reason," *Standard Oil Co. v. U. S.*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), must be applied in determining whether the implementation and operation of the Dealer Enterprise program, by the defendants in this case, had the effect of unreasonably discriminating in favor of the factory-controlled dealers to the detriment of competing private capital dealers resulting in an unreasonable restraint of trade or commerce.

■ A combination or conspiracy is, of course, an essential element of a section 1 violation. Defendants have argued that a corporation cannot combine or conspire

**1016**

with its subsidiaries.[5] The Supreme Court has made clear, however, that

> [e]ven commonly owned firms must compete against each other, if they hold themselves out as distinct entities. "The corporate interrelationships of the conspirators . . . are not determinative of the applicability of the Sherman Act."

*U. S. v. Citizens and Southern National Bank*, 422 U.S. 86, 116–117, 95 S.Ct. 2099, 45 L.Ed.2d 41 (1975), *citing U. S. v. Yellow Cab Co.*, 332 U.S. 218, 227, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947). *See Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 141–42, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968). The Court of Appeals for the Third Circuit has specifically held in *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338 (3rd Cir. 1975) that "although a party cannot combine or conspire with itself, a parent corporation, such as [Chrysler Corporation], can combine or conspire with its wholly owned subsidiaries." *Id.* at 1345. In order to show that a Sherman Act conspiracy existed plaintiffs are not required to prove that the defendants entered into an explicit agreement. *U. S. v. General Motors Corp.*, 384 U.S. 127, 132–43, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *U. S. v. Parke-Davis & Co.*, 362 U.S. 29, 44–45, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960). Circumstantial evidence including the conduct of the parties may be relied upon to prove the existence of the conspiracy or agreement. *Coleman*, 525 F.2d at 1345. The various acts complained of should be viewed together in determining whether defendants entered into a combination or conspiracy. As the Supreme Court stated in *Continental Ore Co. v. Union Carbide*, 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1960):

> It is apparent from the foregoing that the Court of Appeals approached Continental's claims as if they were five completely separate and unrelated law suits. We think that this was improper. In cases such as this, plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components in wiping the slate clean after scrutiny of each. " . . . [T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole. *United States v. Patten*, 226 U.S. 525, 544 [33 S.Ct. 141, 57 L.Ed. 333] . . . ; and in a case like the one before us, the duty of the jury was to look at the whole picture and not merely at the individual figures in it." *American Tobacco Co. v. United States*, 147 F.2d 93, 106 (C.A.6th Cir.) See *Montague & Co. v. Lowry*, 193 U.S. 38, 45–46 [24 S.Ct. 307, 309, 48 L.Ed. 608].

370 U.S. at 698–99, 82 S.Ct. at 1410. Not only was there considerable direct testimony concerning the overall plan to give preferential treatment to DE dealers, but there was also circumstantial evidence that the named defendants were part of a combination or conspiracy. Both Chrysler Credit, which absorbed losses on DE dealers' retail installment paper, and Chrysler Realty, which leased facilities to DE dealers for less than the amount required to amortize the underlying loans for construction of those facilities, received direct contributions from Chrysler Corporation and Chrysler Motors Corporation. Thus sufficient evidence was presented to create a jury question as to whether a combination or conspiracy existed among the named defendants. *See Coleman*, 525 F.2d at 1345; *Mt. Lebanon Motors, Inc. v. Chrysler Corp.*, 283 F.Supp. 453, 458 (W.D.Pa.1968), *aff'd*, 417 F.2d 622 (3d Cir. 1969).

 Defendants further contend that economic activities are not actionable under the antitrust laws unless they cause an injury to the public.[6] The Sherman Act was, of course, designed to protect the public from injury, *Coleman*, 525 F.2d at 1346. Congress determined by legislative fiat, however, that certain classes of restraints of trade were by their "nature or character" injurious to the public. *Klor's Inc. v. Broadway-Hale Stores*, 359 U.S. 207, 210–

---

**5.** Defendants' main brief, at 100.

**6.** Defendants' main brief, at 101.

211, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Radovich v. National Football League*, 352 U.S. 445, 453–454, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957); *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 493, 60 S.Ct. 982, 84 L.Ed. 1311 (1940); *Standard Oil Co. v. U. S.*, 221 U.S. 1, 58, 65, 31 S.Ct. 502, 55 L.Ed. 619 (1911). Where economic activities have a "tendency" to unreasonably restrain trade in light of the congressionally determined criteria of public harm, "it [is] not for the courts to decide whether in an individual case injury [has] actually occurred." *Klor's Inc. v. Broadway-Hale Stores*, 359 U.S. 207, 211, 79 S.Ct. 705, 709, 3 L.Ed.2d 741 (1959), *citing Standard Oil Co. v. U. S.*, 221 U.S. 1, 63–68, 31 S.Ct. 502, 55 L.Ed. 619 (1911). *See Radovich v. National Football League*, 352 U.S. 445, 453–454, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957); *Standard Sanitary Manufacturing Co. v. U. S.*, 226 U.S. 20, 49, 33 S.Ct. 9, 57 L.Ed. 107 (1912); *U. S. v. American Tobacco Co.*, 221 U.S. 106, 179, 31 S.Ct. 632, 55 L.Ed. 663 (1911). Therefore, in a private antitrust action the plaintiff is not required to prove an injury to the public as a material element in his case. *Coleman*, 525 F.2d at 1346.

It is essential, however, that plaintiff show that the challenged practices adversely affected "competition in the marketplace." *U. S. v. Arnold, Schwinn & Co.*, 388 U.S. 365, 375, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967); *White Motor Co. v. U. S.*, 372 U.S. 253, 262, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963); *Coleman*, 525 F.2d at 1346; *Venzie Corp. v. United States Mineral Products Co.*, 521 F.2d 1309, 1316 (3d Cir. 1975). Regardless of the extent of injury suffered by Glauser Dodge there can be no recovery unless the defendants' conduct produced a substantially adverse effect on competition in the relevant market. As the Supreme Court emphasized in *Brown Shoe Co. v. U. S.*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), "[i]t is competition, not competitors which the Act protects." *Id.* at 344, 82 S.Ct. at 1534.

There was sufficient evidence adduced at trial to permit the jury to infer that as a result of the defendants' preferential treatment of the DE dealers, Glauser Dodge was eventually forced out of business. The court of appeals in *Coleman, supra*, found that the elimination of an independent Chrysler dealer, as a result of the implementation of Chrysler's Dealer Enterprise program, had an adverse effect on competition in the marketplace. 525 F.2d at 1347. The court reasoned that there was an impact upon the prices charged for new automobiles and the service provided by Chrysler Dealers.

> [W]e perceive an anti-competitive effect from the elimination of the Coleman dealership. As long as there are several Dodge dealerships with different owners, they can compete within the narrow range of price jurisdiction for the sales of those persons who want Dodge vehicles. The elimination of an independent dealer diminishes that competition. If all independent dealerships were eliminated, Chrysler could eliminate price competition within the full range of price jurisdiction. Another area of competition between automobile dealers is service. If all independent dealers were eliminated, competition in price of parts and service and in quality of service could also be eliminated. . . . [I]t is common knowledge that quality of service is vital to a successful automobile dealership.

525 F.2d at 1347. (citations omitted).

In *Mt. Lebanon Motors, Inc. v. Chrysler Corp.*, 283 F.Supp. 453 (W.D.Pa.1968), the plaintiff urged essentially the same arguments as did Glauser Dodge in attacking Chrysler Corporation's implementation of the Dealer Enterprise program. There was evidence offered tending to show that the Chrysler-financed dealerships engaged in predatory practices to eliminate independent competitors, and that losses at the retail level were offset by Chrysler's manufacturing profits. The court concluded that a jury question was presented as to whether Chrysler's forward integration resulted in an unreasonable restraint of trade, 283 F.Supp. at 457–460, and the Court of Appeals for the Third Circuit affirmed. 417 F.2d 622 (3rd Cir. 1969). *Mt. Lebanon Mo-*

*tors* was also cited with approval by the court of appeals in *Rea v. Ford Motor Co.*, 497 F.2d 577, 590 (3rd Cir. 1974).

The district court in *Rea v. Ford Motor Co.*, 355 F.Supp. 842 (W.D.Pa.1973) also found a violation of the antitrust laws resulting from Ford Motor Company's implementation of its manufacturer-financed dealership program.

Ford Motor Company, by operating factory stores and dealer development stores which were under its domination, was in competition with its own dealers. Therefore, when it adopted a course of action in combination with such stores to drive any of these independent dealers out of business or to dominate the market, it was certainly engaged in combination or conspiracy or [sic] restraint of trade under the Sherman Act. *See United States v. McKesson and Robbins, Inc.*, 351 U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209 (1956).

355 F.Supp. at 865. The court of appeals reversed on other grounds, discussed *infra*, but did not disturb the above analysis, stating that their "decision . . . in no way undermines the proposition that automobile manufacturers are subject to the strictures of the antitrust laws in the operation of their wholly-owned outlets." *Rea v. Ford Motor Co.*, 497 F.2d 577, 590 (3rd Cir. 1974). Moreover, it has been held that the elimination of competitors from any substantial market constitutes a restraint of trade, regardless of whether there is a discernable impact upon the national economy. *Klor's, Inc. v. Broadway-Hale Stores*, 359 U.S. 207, 213, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *International Salt Co. v. U. S.*, 332 U.S. 392, 395–396, 68 S.Ct. 12, 92 L.Ed. 20 (1947); *Mt. Lebanon Motors*, 283 F.Supp. at 459.

▆ It must also be shown, of course, that the defendants' actions which resulted in a restraint of trade were unreasonable. In determining whether or not a particular combination or conspiracy restrained trade unreasonably, one of the factors the jury must consider is the business or economic rationale which motivated the defendants' conduct. *U. S. v. Arnold, Schwinn & Co.*,

388 U.S. 365, 375, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967); *Chicago Board of Trade v. U. S.*, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918). The defendants point out that it is not unlawful for an automobile manufacturer to create new retail outlets and to provide financial assistance to them. They argue that it was necessary to fill gaps in their retail distribution system in order to compete effectively against General Motors Corporation and Ford Motor Company. Any adverse effect upon intrabrand competition, defendants contend, would be justified by the enhancement of interbrand competition. The Supreme Court has made clear, however, that legitimate business motives do not immunize otherwise objectionable conduct. *U. S. v. Arnold, Schwinn & Co.*, 388 U.S. 365, 375, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967); *Delaware Valley Marine Supply Co. v. American Tobacco Co.*, 184 F.Supp. 440 (E.D.Pa.1960), aff'd 297 F.2d 199 (3rd Cir.), *cert. denied* 369 U.S. 839, 82 S.Ct. 867, 7 L.Ed.2d 843 (1962). The defendants' business reasons are relevant only "because knowledge of intent may help the Court to interpret facts and to predict the consequences." *Chicago Board of Trade v. U. S.*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918). Rather, the court's inquiry must focus upon effect, not intent. *Coleman*, 525 F.2d at 1345, n. 10.

▆ While there is nothing inherently unlawful in attempting to increase profits at the manufacturing level by operating retail outlets at a loss or break-even basis, *Mt. Lebanon Motors*, 283 F.Supp. at 458, *citing U. S. v. Aluminum Co. of America*, 233 F.Supp. 718, 727–728 (E.D.Mo.1964) and *Reynolds Metals Co. v. FTC*, 114 U.S.App. D.C. 2, 309 F.2d 223, 229 (1962), a violation of the Sherman Act results if competition in the marketplace is adversely affected in the process. The court of appeals explained in *Coleman, supra*, that although a totally vertically integrated distribution structure may be permissible, "it is at least subject to the qualification that a lawful and achieved by unlawful means is not protected from the antitrust laws." 525 F.2d at 1347. While the Sherman Act, to be sure, is aimed

at preserving competitive activity, there is no justification for violating the Act in one particular market in order to further competition in a larger, more important market. In *U. S. v. Topco Associates Inc.*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972) the Supreme Court stated that:

> [a]ntitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise. They are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms. And the freedom guaranteed each and every business, no matter how small, is the freedom to compete—to assert with vigor, imagination, devotion, and ingenuity whatever economic muscle it can muster. Implicit in such freedom is the notion that it cannot be foreclosed with respect to one sector of the economy because certain private citizens or groups believe that such foreclosure might promote greater competition in a more important sector of the economy. Cf. *U. S. v. Philadelphia National Bank*, 374 U.S. 321, 371 [83 S.Ct. 1715, 1745, 10 L.Ed.2d 915] (1963).

405 U.S. at 610, 92 S.Ct. at 1135. In any event, defendants' desire to increase Chrysler's competitiveness on the interbrand level does not explain the reasonableness of their conduct. Indeed, this goal could have been more effectively pursued had the financial and other assistance, which the defendants provided DE dealers, been extended to independent dealers as well. The court concludes that sufficient evidence was adduced at trial to support a finding that the defendants violated section I of the Sherman Act.

## II. THEORY OF DAMAGES

■ Recovery under section 4 of the Clayton Act, 15 U.S.C. § 15 is not warranted merely by proof that the defendants have violated the antitrust laws. In addition, it must be demonstrated that the defendants' conduct caused injury to the plaintiff's "business or property." The plaintiff must then show the amount of damages which have been suffered, using a reasonable method of computation.

■ The fact of injury may be shown by circumstantial evidence. Due to the practical difficulty of marshalling evidence in private antitrust actions, the Supreme Court has stated that the fact of injury should not be subject to a rigorous standard of proof. *Zenith Corp. v. Hazeltine*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969):

> Trial and appellate courts alike must . . . observe the practical limits of the burden of proof which may be demanded of a treble-damage plaintiff who seeks recovery for injuries from a partial or total exclusion from a market; damage issues in these cases are rarely susceptible of the kind of concrete detailed proof of injury which is available in other contexts. The Court has repeatedly held that in the absence of more precise proof, the fact finder may "conclude as a matter of just and reasonable inference from the proof of defendants wrongful acts and their tendency to injure plaintiff's business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs."

*Id.* at 123–124, 89 S.Ct. at 1576, citing *Bigelow v. RKO Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946). The fact finder may draw a reasonable inference from the evidence presented at trial to conclude that a causal relationship existed between the defendants' conduct and the injuries complained of:

> [T]he jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly. In such circumstances "juries are allowed to act upon probable and inferential, as well as direct and positive proof." *Story Parchment Co. v. Paterson Co.*, 282 U.S. 555, 561–564 [51 S.Ct. 248, 251, 75 L.Ed. 544] (1931); *Eastman Kodak Company v. Southern Photo Co.*, 273 U.S. 359, 377–379 [47 S.Ct. 404, 405, 71 L.Ed. 684] (1927).

*Bigelow v. RKO Pictures, Inc.*, 327 U.S. 251, 264–265, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946). The court must determine, then, whether sufficient evidence was produced for the jury to find a "reasonable probability," *Flintkote Co. v. Lysfjord*, 246 F.2d 368, 392 (9th Cir. 1957), that the defendant's conduct was a "material cause of some injury to [plaintiff's] business or property." *Rea v. Ford Motor Co.*, 497 F.2d 577, 589 (3rd Cir. 1974).

■■■■■ Although the theory of the section I violation of this case is based upon the elimination of the plaintiff from the marketplace, recovery is not limited to the value of Glauser Dodge as a going concern when it was forced out of business.[7] Defendants are also liable for causing injuries to the plaintiff while it was still in business, if those injuries contributed to its ultimate elimination from the marketplace. *See Brown Shoe Co. v. U. S.*, 370 U.S. 294, 346, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); *Klor's, Inc. v. Broadway-Hale Stores*, 359 U.S. 207, 213–214, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Times-Picayune*, 345 U.S. 594, 622–623, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); *International Salt Company v. U. S.*, 332 U.S. 392, 396, 68 S.Ct. 12, 92 L.Ed. 20 (1947); *NBO Industries Treadway Companies v. Brunswick Corp.*, 523 F.2d 262, 272 (3rd Cir. 1975).

■■■■■ Once the fact of injury has been established, the plaintiff must then show the amount of damages suffered by a reasonable method of computation without resorting to speculation or guess work. *Bigelow v. RKO Pictures*, 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946). As with the fact of injury, however, courts have not insisted upon unduly rigorous proof of the quantum of plaintiff's injury. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123–124, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563–564, 51 S.Ct. 248, 75 L.Ed. 544 (1931); *Coleman*, 525 F.2d at 1352–1353. The liberal standard for computation of damages in private antitrust actions has been adopted not only because of practical limits of the burden of proof, but also in view of the public function served by such actions.[8]

■■■■ Thus, both the fact of injury and the quantum of damages must be analyzed for each element of damages sought by the plaintiff. The first claim for recovery is based upon the defendants' subsidy of the Camden area DE dealers' operating losses. The theory of the operating loss subsidy was explained by the plaintiff's expert witness, Dr. Kuehn, as follows: The Camden area DE dealers sold new automobiles at a minimal markup resulting in overall operating losses which were subsidized by Chrysler. Since the prices Glauser Dodge could charge for new automobiles were, in effect, controlled by these competitors, Glauser suffered a direct injury from this discriminatory treatment. Dr. Kuehn computed the amount by which the DE dealers' return on investment fell short of a projected 14 per cent "normal" pre-tax profit. He then determined the average loss-per-car absorbed by the DE dealers and multiplied that figure by the number of units sold each year by the plaintiff. Although there was conflicting testimony at trial, sufficient evidence was presented for the jury to conclude that the DE dealers' overlapping sales territory and advertising practices forced Glauser Dodge to sell new automobiles at

---

**7.** Defendants incorrectly cite *Coleman* for the proposition that a plaintiff asserting a "company dealership" claim must prove that it was, in fact, eliminated from the marketplace. Defendants supplemental brief, at 5–6. The court in *Coleman* did not take this position, nor did it imply that damages would be limited to the value of the business destroyed. *See Coleman*, 525 F.2d at 1351–1353. It is well settled that "the antitrust laws strike equally at nascent and accomplished restraints of trade, monopolistic designs as well as results are reached by the prohibition of the Sherman Act." *Times-*

*Picayune v. U. S.*, 345 U.S. 594, 622–623, 73 S.Ct. 872, 888, 97 L.Ed. 1277 (1953). See discussion, *infra*, regarding damages recoverable for injuries incurred prior to elimination from the marketplace. In any event, there was sufficient evidence presented at trial to support a jury finding that defendants' conduct in violation of the antitrust laws resulted in the demise of Glauser Dodge.

**8.** Areeda, *Anti-Trust Violations without Damage Recoveries*, 89 Harv.L.Rev. 1127 (1976).

approximately the same low markups. In contrast to *Rea v. Ford Motor Co.*, 497 F.2d 577 (3rd Cir. 1974), the plaintiff here has demonstrated the fact of injury resulting from the defendants' discriminatory conduct. The plaintiff in *Rea* employed a subsidy approach, but failed to demonstrate any direct injury to his business or property. The independent dealer produced no evidence that the Ford-owned outlets engaged in predatory price cutting, or that it had been compelled to lower prices. The plaintiff made no attempt to show that it had incurred greater operating expenses or had lost any profit as a result of the operation of the company-owned outlet. The court of appeals observed that the attorney for the independent dealer expressly disavowed any such claims:

> What our position is in this case is what 22 Ford did or did not do is not relevant because we are not asserting in our case that 22 Ford sustained a loss of profits . . . [W]e haven't put any evidence in the record to indicate any particular loss sustained by 22 Ford.

497 F.2d at 589.

▆▆▆▆ Plaintiff asserts that since its prices were controlled by the DE dealers, the measure of damages is, therefore, a proportional amount of the discriminatory subsidies provided by Chrysler. Glauser's profit margin was decreased to the extent its competitors were illegally favored.[9] This method of computing damages is a reasonable estimate of those profits lost by Glauser Dodge which can be traced to illegal conduct by the defendants. The computed subsidies for operating losses-per-car of the Camden area DE dealers are as follows:

| Year | Amount |
|------|--------|
| 1964 | $187.50 |
| 1965 | 280.39 |
| 1966 | 157.98 |
| 1967 | 98.03 |
| 1968 | 2.31 |
| 1969 | None |
| 1970 | 15.20 |

The plaintiff perhaps could have sought a greater recovery for lost profits by subtracting the actual average markup on new automobiles from some hypothetical markup which the market would have borne absent competition from the Camden area De dealers.[10] Such an approach in this case, however, would have failed to account for the effect of lawful competition from these DE dealers. *See Coleman*, 525 F.2d at 1352.[11] If a direct correlation can be shown between an antitrust defendants' discriminatory conduct and the profits lost by the plaintiff, the amount of discrimination is an acceptable measure of damages. *See Hanover Shoe v. United Shoe Machinery Corp.*, 392 U.S. 481, 489, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968); *Bruce's Juices v. American Can Co.*, 330 U.S. 743, 757, 67 S.Ct. 1015, 91 L.Ed. 1219 (1947); *cf. Union Carbide and Carbon Corp. v. Nisley,* 300 F.2d 561, 580 (10th Cir. 1961). Where "prices are illegally discriminatory, petitioner has been damaged, in the absence of extraordinary circumstances, at least in the amount of that discrimination." *Bruce's Juices v. American Can Co.*, 330 U.S. 743, 757, 67 S.Ct. 1015, 1021, 91 L.Ed. 1219 (1947). "The rea-

---

9. Plaintiff's main brief, at 112.

10. For example, plaintiff might have asserted one of the two major theories of proving lost profits in private antitrust suits. By using the "before and after" approach Glauser might have introduced evidence of the average markup on its new automobiles prior to the depressing influence of the DE dealers. By using the "yardstick" test plaintiff could have shown the average markup used by firms closely comparable to Glauser Dodge which were unaffected by such restraints during the time period in question. See Note, *Private Treble Damages Anti-Trust Suits; Measure of Damages for De-*

*struction of All or Part of a Business,* 80 Harv. L.Rev. 1566, 1574–1575 (1967).

11. For illustrative purposes only, if we assume that the market would bear a markup of $400, lawful competition from four new Chrysler dealers in the area making a normal return on investment of 12% might reduce the competitive selling price to a markup of, for instance, $300. If as a result of discriminatory subsidies from Chrysler these dealers were able to reduce their markup to $200, the plaintiff's actual injury attributable to the unlawful conduct of the defendants would amount to only $100 per automobile, rather than $200.

son is that he has paid more than he should and his property had been illegally diminished, for had the price been lowered his profits would have been higher." *Hanover Shoe v. United Shoe Machinery Corp.*, 392 U.S. 481, 489, 88 S.Ct. 2224, 2229, 20 L.Ed.2d 1231 (1968). In the instant case, instead of directly overcharging the plaintiff, the defendants have obtained the same result by subsidizing the competition which established the plaintiff's sales price. Thus, Glauser's lost profits can be measured by the amount of discrimination to which it has been subjected.[12]

Plaintiff then produced evidence of actual losses it had suffered as a result of the defendants' discriminatory refusal to purchase its retail paper on a without recourse basis. Glauser Dodge was forced to repossess and sell at a loss a substantial number of cars each year. The amount of damages for this fact of injury included the loss on the dealer's actual investment in each repossessed car, as well as the profit it would have realized normally in selling such a used car.

Plaintiff demonstrated a fact of injury and a reasonable measure of damages to support its claim for interest losses on its Chrysler Credit reserve account and short term borrowings. Glauser was required to maintain a non-interest bearing reserve account to cover claims for repossessions, since its retail paper was not purchased on a without recourse basis. There was testimony that the defendants withheld payments for warranty work and incentive bonuses making it necessary for the plaintiff to obtain short term loans, thus incurring further interest losses.

There was also sufficient evidence of the fact of injury suffered by Glauser

Dodge as a result of the defendants' failure to provide physical facilities comparable to those made available to the Camden area DE dealers.

Dr. Kuehn testified that the DE dealers were provided with superior facilities at rental rates which were less than the amounts a private capital dealer such as Glauser Dodge would have to expend to offset construction costs, depreciation, and principal payments on an amortized conventional loan for such facilities. The plaintiff computed the measure of damages by showing the actual costs it had incurred in 1969 and 1970 for reduction of principal and building depreciation. For the years 1965 to 1969 the plaintiff estimated the benefits it had been denied by determining the amount of construction costs, depreciation, and principal payments, from which the Camden area DE dealers had been exempted.

Plaintiff further claimed that as a result of being forced out of business by the defendants' cumulative discriminatory acts, it suffered a direct loss in the value of its new showroom facilities and the value of its inventory. Since the showroom facility was a single purpose property, the reduction in value was a direct result of the plaintiff being forced out of business. Evidence of the before and after value of the showroom facility was corroborated by the defendants' own appraisal of April 1, 1970, and the pretrial stipulation of the parties. The diminution in the value of plaintiff's inventory resulted from Chrysler's refusal to purchase the inventory and sell it to another dealer as was its normal practice upon termination of a dealership. Instead plaintiff was forced to liquidate the inventory piecemeal at a substantial loss.

**12.** Defendants cite *ICC v. U. S.*, 289 U.S. 385, 53 S.Ct. 607, 77 L.Ed. 1273 (1933) and *Enterprise Industries v. Texas Co.*, 240 F.2d 457 (2d Cir. 1957) for the proposition that the amount of discrimination is not a permissible measure of damages in an antitrust suit. These cases, however, involved application of the "pass-on" defense to price discrimination suits, which has since been rejected by the Supreme Court. *Hanover Shoe v. United Shoe Machinery Corp.*,

392 U.S. 481, 483, 495, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968); Note, *Private Treble Damage Anti-Trust Suits; Measure of Damages for Destruction of All or Part of a Business*, 80 Harv.L.Rev. 1566, 1584–1586. In any event, the court in *Enterprise Industries v. Texas Co., supra*, conceded that where the plaintiff's profit margin is directly affected "the amount of the discrimination might well be a proper measure of [his] damages." *Id.* at 459.

Plaintiff also sought recovery for the value of the business as a going concern. The current market value of a business is, in theory, the discounted present value of the estimated flow of future earnings.[13] A basis for this estimate is the record of profits for the business in prior years.[14] The evaluations of Glauser Dodge as a going concern, made by plaintiff's expert witness, William Tarlo, were based upon the operating statements of the business over a five year period. There was testimony that the operating statements were more reliable data than the corresponding tax returns of those years because of the tax treatment of parts and used car inventory. In computing the record of earnings over the prior five years, however, Mr. Tarlo failed to deduct as a business expense the salaries paid to Barry Glauser and Mrs. Glauser, thus inflating the records of profits. *Coleman*, 525 F.2d at 1351–1352, n. 22.

Where it is apparent that as a matter of law certain identifiable sums were included in the jury's verdict which were improper, the court has the power to condition the denial of the motion for a new trial upon the filing by the plaintiff of a remittitur in the specified amount. *Dimick v. Schiedt*, 293 U.S. 474, 483–486, 55 S.Ct. 296, 79 L.Ed. 603 (1935); *Holmes v. Wack*, 464 F.2d 86 (10th Cir. 1972); *Jones v. Friesel*, 207 F.Supp. 925, 926–927 (W.D.Pa.1962). The portion of the claim for the value of the business as a going concern, which is attributable to the treatment of owners' salaries as earnings, can be accurately computed. For the two methods of evaluation employed by Mr. Tarlo the amounts are respectively $78,254.00 and $67,075.00.[15] Consistent with the right to trial by jury

guaranteed by the Seventh Amendment, an excessive verdict should be reduced only to the maximum amount that the jury might properly have awarded. *U. S. v. 1160.96 Acres of Land in Holmes County, Mississippi*, 432 F.2d 910 (5th Cir. 1970; 11 Wright & Miller, *Federal Practice and Procedure* 104. Thus, the plaintiff will be required to remit the amount of $201,225.00.[16] Due to the nature and amount of this improper element of damages, evidence regarding it was not so prejudicial as to have infected the decision of the jury on the question of liability or the remainder of the damages. *Cf. Minneapolis, St. P. & S. Ste. M. Ry. v. Moquin*, 283 U.S. 520, 51 S.Ct. 50, 75 L.Ed. 1243 (1931); *Ford Motor Co. v. Mahone*, 205 F.2d 267 (4th Cir. 1953).

## III. TRIAL ERRORS

Defendants finally contend that a new trial is warranted due to errors in the admission of certain evidence during the trial, the opening and closing arguments of counsel for plaintiff, and the charge to the jury. The thrust of the defendants' discussion of these alleged errors is that the evidence and argument presented by the plaintiff were not supported by a valid theory of liability under the antitrust laws. These arguments have been addressed at length in parts I and II above. The court has carefully considered the defendants' remaining contentions and concludes that there were no errors so prejudicial as to affect the substantial rights of the parties. Fed.R.Civ.P. 61.

Therefore, the defendants' motions for judgment notwithstanding the verdict or a new trial will be denied, conditioned upon the filing of a stipulation within twenty (20) days that $201,225 of the amount

---

13. Note, *Private Treble Damage Anti-Trust Suits; Measure of Damages for Destruction for All or Part of Business*, 80 Harv.L.Rev. 1566, 1580–1581 (1967).

14. Since the challenged practices continued for several years leading up to the elimination of Glauser Dodge from the marketplace, the plaintiff properly presented to the jury estimates of the value of the business as a going concern based upon its actual performance in prior

years and, alternatively, based upon the earnings which the business would have had absent the defendants' unlawful conduct.

15. The estimates were based upon the "times earnings" method and the section 1001 of the Internal Revenue Code method. Revised Exhibits P–12A and P–12B.

16. $67,075.00 trebled.

**1024**

awarded under the verdict will be remitted by the plaintiff.

An appropriate order may be submitted.